# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-KA-00836-SCT

*NATASHA GRAHAM a/k/a NATASHA J. GRAHAM*
*a/k/a NATASHA JEAN GRAHAM a/k/a "TASHA"*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/20/2012 |
| TRIAL JUDGE: | HON. ANTHONY ALAN MOZINGO |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ERIN E. PRIDGEN |
| | GEORGE T. HOLMES |
| | KARL C. HIGHTOWER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: STEPHANIE B. WOOD |
| | JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/13/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE WALLER, C.J., CHANDLER AND KING, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.    A Lamar County jury found Natasha Graham guilty of murder and conspiracy to commit murder. She was sentenced to life imprisonment. Graham now appeals her conviction to challenge the sufficiency and weight of the evidence presented at trial. Finding no error, we affirm.

**FACTS & PROCEDURAL HISTORY**

¶2.     Natasha Graham, Ethan Dixon, and Ronald Hartfield were charged with the murder of Tabitha Hartfield and with conspiracy to commit murder. Graham's trial took place from March 26, 2012, to March 28, 2012.

¶3.     Dixon[1] was the only codefendant who testified at Graham's trial. Dixon testified in exchange for the State's recommendation that he receive a twenty-five-year sentence. The jury was informed of this agreement at the beginning of Dixon's testimony. Dixon and Graham were romantically involved and were living together at the time of the murder. At trial, Dixon recounted the series of events leading to Tabitha's murder.

¶4.     On Saturday, May 24, 2008, Tabitha and her husband Ronald arrived at Graham's mobile home. Graham, Dixon, Tabitha, and Ronald left together to pick up some beer and some pills and then drove to an apartment complex in Prentiss. When the group tried to leave the apartments later that night, Tabitha expressed a desire to stay, but Ronald forced her to the car. During the drive back to Graham's mobile home, Tabitha attempted to jump out of the vehicle, but Dixon was able to hold the door shut. Tabitha then got into an altercation with Graham because Graham accused Tabitha of hitting Dixon. Later, Tabitha and Graham got into another altercation when Tabitha accused Ronald of having an affair with Graham.

¶5.     When the group arrived at Graham's mobile home, Tabitha sat outside, while Ronald, Dixon, and Graham went inside. Tabitha attempted to leave the mobile home in Ronald's car, but drove into a ditch on the side of the driveway. She then got out of the car and sat on the

---

[1] Ethan Dakota Dixon is also referred to by the nickname "Cody" in parts of the record. To avoid confusion with Cody Claburn, we refer to both parties by their last names.

curb at the side of the driveway. Dixon and Ronald attempted to free the car from the ditch but were unable to do so, which made Ronald very angry. At this point, Graham was still inside the mobile home. According to Dixon, Graham crushed up some pills, mixed them into a glass of water, and gave the concoction to Tabitha. Then, Graham, Dixon, and Ronald went back to the mobile home while Tabitha remained outside. Thirty to forty-five minutes later, Ronald and Dixon came outside, and Ronald began to strangle Tabitha with a dog leash. Ronald stopped when he saw Jeremy Gibson driving up the driveway.

¶6.    Gibson testified that he had driven to Graham's mobile home to see if he could obtain some pills from her. When he pulled into Graham's driveway, he noticed someone lying in the road. He honked his horn several times, and the person sat up. Gibson recognized the person as Tabitha. Gibson then saw Ronald walking toward his truck, so he drove away, stating, "[M]e and her husband or whatever doesn't get along at all. . . ." Shortly thereafter, Gibson returned to the mobile home. Tabitha was still lying in the driveway, but she did not move at all when Gibson honked his horn at her. Gibson drove around her and approached the mobile home. He spoke with Graham about trying to find some pills, and Graham told him, "Now is not a really good time." He also noticed Dixon looking out one of the windows of the mobile home. Ronald came out of the mobile home and tried to confront Gibson, so Gibson drove away again and did not return.

¶7.    After Gibson left, Dixon testified that Ronald continued to strangle Tabitha until she stopped moving. Dixon and Ronald went back inside the mobile home, and Ronald threatened to hurt Dixon's family if he contacted the police. Ronald, Dixon, and Graham then

3

went outside to Tabitha's body. Graham cut Tabitha's wrists with a steak knife, wrapped her body in a blanket, and placed her in a lawnmower trailer.

¶8.     The next morning, Ronald called a friend to pick him up from Graham's mobile home. Dixon and Graham attached the trailer containing Tabitha's body to a lawnmower and drove into the woods behind Graham's grandmother's old house. Graham removed Tabitha's shirt and bra, and then Graham and Dixon buried the body.

¶9.     Cody Claburn testified that, on May 31, 2008, after returning home from a bar, Graham told him that she and someone else had killed Tabitha, and that she was going to turn herself in to the police. Claburn asked Graham who had helped her kill Tabitha, but she did not respond. Graham asked Claburn to pack his things and go, and then she left the trailer and called 911. The jury was allowed to hear a recording of the 911 call.

¶10.    Officer Jason Alexander of the Lamar County Sheriff's Department responded to Graham's call. He found Graham walking down the road talking on her cell phone. When Officer Alexander asked Graham if she needed help, Graham responded, "I murdered my cousin." Graham also told Officer Alexander approximately where the body was located. At that point, Officer Alexander took Graham into custody and read her *Miranda* warnings.[2] After waiving her *Miranda* rights, Graham explained that no one had helped her kill Tabitha, but that Dixon had helped her hide the body.

¶11.    Graham led Officer Alexander and two other officers to an area behind Graham's grandmother's house, where they located a shallow grave, with what appeared to be a person's

_____

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

knee protruding from the dirt. The Lamar County Sheriff's Office was notified of this finding, and Chief Investigator Richard Cox went to the scene in the morning hours of June 1, 2008, with a crime-scene investigation unit. After securing the site, the investigators began to excavate the body. Investigator Cox and his team uncovered the body of a female at the site and turned it over to the coroner.

¶12.    The next day, on June 2, 2008, after receiving Graham's written consent, Cox searched Graham's mobile home. Graham had told Cox that she had used a blue dog leash to choke Tabitha and had washed the leash after using it. Cox collected two blue dog leashes from Graham's laundry room. Cox did not send the leashes to the crime lab, stating that any washing would have destroyed any possible DNA evidence. Graham also told Cox that she had used a steak knife to cut Tabitha's wrists and had washed the knife after using it. Cox searched Graham's kitchen and found that all of her knives looked the same. The knives were not taken from the crime scene.

¶13.    Steven Hayne, M.D., testified regarding his autopsy of Tabitha's body. Tabitha's body had undergone significant postmortem decomposition. Three slash wounds were on Tabitha's wrists  – two on the left wrist and one on the right wrist. Dr. Hayne concluded that these wounds probably were sustained postmortem, because there was no evidence of bleeding at the wound sites. An internal investigation of Tabitha's body revealed bleeding around her larynx and voice box, which was consistent with strangulation. Dr. Hayne opined that Tabitha's cause of death was strangulation, and the manner of death was homicide. Dr. Hayne collected blood samples and performed a sexual assault kit to be analyzed by a crime lab. Dr. Hayne then sent the samples to the St. Louis, Missouri, medical examiner's office for testing.

¶14.    Dr. Christopher Long, chief toxicologist for the City and County of St. Louis, Missouri,[3] received the blood samples from Dr. Hayne's office on June 3, 2008. He screened the blood samples for the presence of drugs and alcohol. Dr. Long testified that Tabitha's blood contained .089 grams percent of ethyl alcohol. Dr. Long could not determine if this was due to the consumption of alcohol or from decomposition. Tabitha's blood also tested positive for amphetamines and benzodiazepines. Like the alcohol, Dr. Long stated that the presence of these substances could be a product of decomposition.

¶15.    Joseph Bryant, who was Ronald's cellmate for several months at the Forrest County Jail,[4] testified that Ronald had told him that he had killed his wife by choking her with a dog chain and buried her. Ronald indicated to Bryant that he and his girlfriend previously had talked about murdering his wife. On cross-examination, Bryant stated that Ronald had told him another male was involved in the murder, as well.

¶16.    Graham chose not to testify and offered no witnesses or evidence at trial. The jury found Graham guilty of murder and conspiracy to commit murder. Graham was sentenced to life imprisonment on the murder conviction. She also received a twenty-year sentence for conspiracy to commit murder, to run consecutively to her life sentence. Graham subsequently

---

[3] Dr. Long testified that his office receives samples for testing from numerous municipalities around the country and handles between eight and ten thousand cases per year. In addition, Dr. Long stated that, as part of his job, he often travels to testify in court as an expert in the field of forensic toxicology, stating that he has done so "easily at least a couple hundred times."

[4] Bryant stated that he was incarcerated because he struck a motorcycle with his vehicle while he was driving drunk and then left the scene. He was sentenced to fifteen years' imprisonment. Bryant testified that he had been sentenced prior to agreeing to testify in this case, and he had received no promises in exchange for his testimony.

filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial. The trial court denied those motions. Graham now appeals her convictions to this Court, challenging the sufficiency of the evidence supporting her conviction for conspiracy to commit murder and arguing that her conviction for murder was against the overwhelming weight of the evidence.

### Discussion

### I. The evidence was sufficient to support Graham's conviction for conspiracy to commit murder.

¶17.    Graham was found guilty of conspiring with Ronald and Dixon to murder Tabitha. Graham argues that the trial court erred in failing to grant her motion for judgment notwithstanding the verdict because the evidence was insufficient to find her guilty of conspiracy to commit murder.

¶18.    This Court reviews challenges to the legal sufficiency of evidence in the light most favorable to the verdict. *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005). The State receives the benefit of all favorable inferences reasonably drawn from the evidence. *Hughes v. State*, 983 So. 2d 270, 275-276 (Miss. 2008). If any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt, this Court will not disturb the verdict. *Bush*, 895 So. 2d at 843.

¶19.    A conspiracy occurs when two or more persons agree to accomplish an unlawful purpose, or agree to accomplish a lawful purpose unlawfully. *Clayton v. State*, 582 So. 2d 1019, 1021 (Miss. 1991); Miss. Code Ann. § 97-1-1(1)(a) (Supp. 2012). A conspiracy is a completed offense and does not require proof of an overt act in furtherance of the conspiracy.

7

*Ford v. State*, 546 So. 2d 686, 688 (Miss. 1989). Further, no express agreement is required; an agreement can be inferred from the surrounding circumstances, such as the "declarations, acts and conduct of the alleged conspirators." *Barnes v. State*, 493 So. 2d 313, 315 (Miss. 1986) (citations omitted). An alleged conspirator's participation in a conspiracy may be proved entirely by circumstantial evidence. *Davis v. State*, 485 So. 2d 1055, 1058 (Miss. 1986). However, "There must exist some evidence that a defendant has associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed." *Id.*

¶20.    Graham contends that there was insufficient evidence that she actually entered into an agreement with Ronald and Dixon to kill Tabitha. Graham initially told the 911 dispatcher and Officer Alexander that she had killed Tabitha, and that she had acted alone. She later told the police that Dixon had helped her bury Tabitha's body. Graham argues that these events prove that, if she did murder Tabitha, she acted alone, and that Dixon was only an accessory after the fact.

¶21.    This Court consistently has upheld convictions for conspiracy based on the acts of the alleged coconspirators in the absence of an express agreement. For example, in *Brown v. State*, 796 So. 2d 223 (Miss. 1991), the defendant and two coconspirators were convicted of murder and conspiracy to commit murder. Though there was no evidence of an express agreement to commit the murder, this Court held that the evidence concerning the defendant's conduct on the day of the murder was sufficient for the jury reasonably to conclude that the defendant conspired to murder the victim. *Id.* at 228. On the day of the murder, the defendant gave one of his friends a gun. *Id.* at 226. The defendant recognized the victim walking past

the house where the defendant was staying, and he notified his friend of the victim's presence. *Id.* The defendant chased the victim down an alley, where his friend shot the victim. *Id.* The defendant later told the police that he knew his friend was going to "handle his business" with the victim. *Id.* at 228. The defendant argued that this evidence, which came from the testimony of a codefendant, was insufficient to prove the existence of a conspiracy. *Id.* at 227. The Court found, "A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict." *Id.* (citations omitted). This Court also held that this same evidence was sufficient to convict the defendant of murder as an aider and abettor to the shooter. *Id.* at 228.

¶22.    In *Davis*, 485 So. 2d at 1055, the defendant was charged with conspiracy to possess heroin after she and a friend retrieved a package containing heroin at the Jackson airport. The defendant denied knowledge of the true contents of the package and claimed there was insufficient evidence of a conspiracy. *Id.* She claimed that her only involvement in the offense was driving her friend to the airport and opening the trunk of her car for him. *Id.* This Court found that there was ample evidence that both the defendant and her friend were involved in a conspiracy to possess heroin. *Id.* at 1059. This Court held that evidence is sufficient to prove a conspiracy when all the facts and circumstances, together with the acts of the parties, reveal a common design or understood purpose to commit a crime. *Id.* (citing *Riley v. State*, 44 So. 2d 455 (Miss. 1950); *Spight v. State*, 83 So. 34 (Miss. 1919)). The evidence showed that the man who had sent the package called the defendant's parents' house to notify the defendant's friend of the package's shipment. *Id.* The defendant and her friend spent the night in Jackson awaiting the package's arrival. *Id.* At the airport, the defendant

9

remained in the car and opened the trunk for the friend when he returned with the package. *Id.* Finally, the defendant's purse contained two bags of mannitol, a substance used as a cutting agent for heroin. *Id.* This Court held that this evidence was sufficient for the jury to accept the State's theory of the case. *Id.* at 1059.

¶23. Graham's argument that she acted alone overlooks much of the evidence against her. Dixon stated that, on the night of Tabitha's murder, Graham and Tabitha got into an altercation because Tabitha thought Ronald was cheating on her with Graham. Ronald later told Bryant that he had talked with his girlfriend about killing Tabitha. Bryant also indicated that another male was involved in the killing. Dixon testified that Graham gave Tabitha a mixture of water and crushed up pills shortly before Ronald strangled her with the dog leash. Dixon previously had stated that Ronald had bought some pills earlier that night, and Gibson stated that he came to Graham's mobile home that night to try to get some pills from her. According to Dixon, Graham cut both of Tabitha's wrists and placed her body in a lawnmower trailer. The next day, Graham and Dixon buried Tabitha's body in the woods. On the night Graham turned herself in, she told Claburn that she and someone else had killed Tabitha.

¶24. While the evidence presented against Graham may not prove the existence of an express agreement to murder Tabitha, this Court repeatedly has held that the State is not required to prove the existence of an express agreement. *See Davis,* 485 So. 2d at 1058; *see also Griffin v. State,* 480 So. 2d 1124, 1126 (Miss. 1985) (citing 16 Am. Jur. 2d *Conspiracy* § 42 (1979) ("Where it is shown that the defendants by their acts pursued the same object, one performing one part and the other performing another part so as to complete it or the view to

10

its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to effect that object.")). The evidence showed that Graham, Dixon, and Ronald, while engaged in different acts, all pursued the common object of Tabitha's death. As in *Davis*, it is clear that Graham's jury accepted the State's interpretation of the significance of the evidence, as well as the State's theory of the defendant's participation in a conspiracy to commit murder. Based on the evidence concerning Graham's conduct on the night of Tabitha's murder and the following days, a reasonable jury could find that Graham, Dixon, and Ronald had conspired to act in concert to murder Tabitha. Accordingly, the trial court did not err in denying Graham's motion for JNOV.

## II. Graham's conviction for murder was not against the overwhelming weight of the evidence.

¶25. The jury unanimously found Graham guilty of the murder of Tabitha Hartfield. Graham argues that the trial court erred in granting her motion for a new trial because her conviction for murder was against the overwhelming weight of the evidence.

¶26. In reviewing a challenge to the weight of the evidence, this Court will overturn a verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844. The evidence is viewed in the light most favorable to the verdict. *Id.* If the verdict is against the overwhelming weight of the evidence, the proper remedy is to grant a new trial, but this remedy should be used only in exceptional cases where the evidence "preponderates heavily against the verdict." *Id.*

11

¶27. Graham was charged with deliberate-design murder in violation of Section 97-3-19(1)(a) of the Mississippi Code. Graham argues that the overwhelming weight of the evidence shows that Ronald and Dixon were responsible for Tabitha's death. According to Graham, the only evidence implicating her direct involvement in the murder was her statement to Officer Alexander that she "killed her cousin," which she claims is unreliable.

¶28. Graham's argument overlooks the concept of "aiding and abetting," on which the jury was instructed. Aiding and abetting is "'the offense committed by those persons who, although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator.'" *Smith v. State*, 115 So. 2d 318, 322 (Miss. 1959) (quoting *Wynn v. State*, 63 Miss. 260, 264 (1885)). "[A]ny person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Swinford v. State*, 653 So. 2d 913, 915 (Miss. 1995) (citations omitted).

¶29. It is undisputed that Graham was physically present at the scene of Tabitha's murder. Graham also gave Tabitha a concoction of water and crushed pills shortly before Tabitha was strangled. The murder weapon, a blue dog leash, was found in Graham's trailer. Regardless of whether Graham, Dixon, or Ronald committed the fatal act, "[t]he act of any conspirator is the act of all of the conspirators[.]" *Norman v. State*, 381 So. 2d 1024, 1029 (Miss. 1990). *See also* *Riley v. State*, 44 So. 2d 455 (Miss. 1950) ("[W]hen two or more persons are confederated for the purpose of murdering another, and in furtherance of such common design such person is killed by one of the conspirators, the killing was the act of each regardless of which inflicted the mortal wound."). Allowing the jury's verdict to stand in this case would

not "sanction an unconscionable injustice," as the evidence does not "preponderate heavily against the verdict." **Bush**, 895 So. 2d at 844. The trial court did not err in denying Graham's motion for a new trial.

**Conclusion**

¶30. Graham's challenges to the weight and sufficiency of the evidence are without merit. Therefore, we find that the trial court did not err in denying Graham's motions for JNOV or a new trial. Accordingly, we affirm Graham's convictions and sentences for murder and conspiracy to commit murder.

¶31. **COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF CONSPIRACY TO COMMIT MURDER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES IN COUNT I AND COUNT II ARE TO RUN CONSECUTIVELY WITH EACH OTHER.**

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**