# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00141-COA

SYLVESTER GARNER ON BEHALF OF                 APPELLANT
TRACEY LYNN GARNER, DECEASED

v.

STATE OF MISSISSIPPI                                 APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/02/2014 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | JOHN M. COLETTE SHERWOOD ALEXANDER COLETTE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 05/15/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

GREENLEE, J., FOR THE COURT:

¶1. A jury sitting before the Hinds County Circuit Court, First Judicial District, found Tracey Lynn Garner guilty of depraved-heart murder and conspiracy to commit wire fraud. Garner appeals and claims the circuit court erred when it allowed the prosecution to present expert testimony from three physicians. We disagree. However, the circuit court erred when it denied Garner's motion for a judgment notwithstanding the verdict (JNOV) regarding the conviction for conspiracy to commit wire fraud. Consequently, we affirm the circuit court's

judgment in part, and reverse and render in part.

## FACTS AND PROCEEDINGS BELOW

¶2.     Karima Gordon died pursuing her goal to become what her friend, Angelean Barber, described as an "urban hiphop model." Convinced that she needed silicone injections in her buttocks, in 2010 Gordon began emailing Natasha Stewart, who worked under the stage name, "Pebbelz da Model." Gordon asked Stewart for "information regarding . . . butt enhancement . . . ." Describing it as "a very touchy subject," Gordon asked Stewart to "let [her] know what[]ever [she] ha[d] to do to get this taken care of." She also said that she had "been to numerous websites" but she "could not find the right information." Stewart responded cordially, but she did not disclose anything about the "enhancements" that Gordon sought. Gordon emailed Stewart again and said that she would not "give up on [her] mission to ultimately achieve a tastefully great butt enhancement."[1]

¶3.     In November 2011, Gordon emailed Stewart again. Gordon said she had "not gotten [her] situation fixed yet" and she was "still looking for a good butt job like" Stewart's. Gordon asked for a referral and told Stewart that she did "not mind compensating [her] for this secretive information . . . ." Apparently preferring to speak in person, Stewart invited

---

[1] Emails in the record show that in August 2010, Gordon had contacted at least one other person via an email address that she found on a "forum on butt enhancement." That led to an offer for an "inhouse visit" or to ship Gordon "the item [she] want[ed]." Further discussion led to "Jermey's" offer to perform some service valued at $1,275 for a procedure that would be "off the books" because it could result in Jermey losing his "practice." At trial, it was disputed whether Gordon had injections prior to March 2012.

2

Gordon and Barber to a party she was hosting at a club in Queens, New York. In February 2012, Gordon and Barber flew from Atlanta to Queens. During their meeting at the club, Stewart revealed that "Miss Tracey" had "been doing her[ enhancements] for years." Stewart also represented that "Miss Tracey" was a nurse. However, Stewart did not reveal "Miss Tracey's" contact information or address at that time. Subsequent testimony clarified that "Miss Tracey" was the defendant, Tracey Lynn Garner.

¶4. On March 12, 2012, Stewart sent Garner a text message. Garner replied one minute later. The record does not reveal the substance of their exchange. Garner and Stewart exchanged a few more text messages that week. Again, the record is silent regarding what they said to one another.

¶5. On March 15, 2012, Stewart disclosed Garner's phone number and gave Gordon directions to an address in Jackson, Mississippi. According to Barber, she and Gordon thought the directions were to Garner's house. Even so, Gordon's handwritten directions indicate that she and Barber planned to meet Garner at a Walgreens. The next morning, Gordon and Barber drove from Atlanta to Jackson. During their trip, Gordon and Garner exchanged a number of text messages. Garner's outgoing messages are included in the record, but Gordon's messages are not. Nearly all of Garner's texts were inquiries about Gordon's location. Gordon also communicated with Stewart several times during their trip. When Gordon and Barber arrived at Walgreens in Jackson, Garner was not there. Gordon went inside Walgreens and bought a Green Dot Moneypak card. After using it to send

3

Stewart a $200 referral fee, Garner gave Gordon and Barber directions to her house. Garner was wearing scrubs when she met Gordon and Barber in the driveway.

¶6. When Barber saw that Garner appeared to be transgendered, she decided not to get silicone injections. She waited in one room while Gordon and Garner went into another part of the house. Garner gave Gordon an unknown number of silicone injections. Barber later said that Gordon was in obvious pain after the injections. Barber relayed Gordon's claim that it was "the worst feeling of her life."

¶7. Gordon and Barber immediately started their trip back to Atlanta. They contacted Garner because Gordon had a persistent cough and she was sweating profusely. Garner recommended cough medicine or Benadryl. Around thirty minutes after leaving Garner's house, Barber had to pull over so Gordon could defecate on the side of the interstate. During the return trip, Gordon continued to have difficulty breathing, and Barber had to pull over several times so Gordon could defecate on the side of the road.

¶8. When they got to Stockbridge, Georgia, Barber took Gordon to the emergency room. Gordon and Barber did not tell hospital staff about Gordon's silicone injections because they were scared, and they had been "told not to tell exactly what had happened to her at that time." The hospital released Gordon early the next morning. Two days later, Gordon went back to the emergency room, where she was treated by Dr. Darina Stankeyeva.

¶9. Gordon was initially treated for pneumonia. She later disclosed her recent silicone injections. Testing revealed the presence of pulmonary emboli – "small particula[te]s

4

blocking out the blood vessels in her lungs." Despite medical intervention, Gordon's condition deteriorated until she died on March 24, 2012.

¶10. Gordon's autopsy was performed by Dr. Steve Atkinson, a forensic pathologist employed by the Georgia Bureau of Investigation and the Georgia Medical Examiner's office. When Dr. Atkinson cut into Gordon's buttocks tissue, a clear, oily liquid spilled out. The tissue also contained numerous "cyst like spaces filled with silicone" and "relatively recent" hemorrhaging. Dr. Atkinson opined that Gordon died because some of the silicone entered her bloodstream and eventually lodged in her pulmonary capillaries, effectively preventing oxygen exchange.

¶11. Garner was subsequently charged with depraved-heart murder and conspiracy to commit wire fraud. At trial, the prosecution called fifteen witnesses during its case-in-chief. The evidence showed that Garner had never been a licensed medical professional. Instead, her most recent employment had been as a cook at a nursing home. There was also testimony that Gordon had been healthy and active before Garner gave her silicone injections. Investigator Lee McDivitt of the Mississippi Attorney General's Office testified that he executed a search warrant at Garner's house, and he found numerous needles, large-gauge syringes labeled "for veterinary use only," ten bottles of superglue, cotton balls, a massage table, and a large container of silicone.

¶12. Three of the prosecution's witnesses were medical experts. During cross-examination, Dr. Constantino Mendieta, a plastic and reconstructive surgeon, rejected the

5

suggestion that Gordon's death was caused by silicone that had been injected prior to March 2012. Dr. Stankeyeva testified that Gordon was treated for complications related to the March 2012 silicone injections. Dr. Atkinson testified that the March 2012 silicone injections caused Gordon's death.

¶13. Garner chose not to testify, and she did not call any witnesses in her defense. As mentioned above, the jury found her guilty of depraved-heart murder and conspiracy to commit wire fraud. Following her unsuccessful motion for a JNOV, Garner appeals.[2]

## DISCUSSION

### I. Expert Testimony

¶14. Garner claims that each of the prosecution's medical experts provided inadmissible testimony. "[T]he admission of expert testimony is within the discretion of the trial court." *Gray v. State*, 202 So. 3d 243, 256 (¶46) (Miss. Ct. App. 2015). We will not reverse the trial court's decision to admit expert testimony unless it "was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id*.

¶15. A witness qualified as an expert may testify in the form of an opinion if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the

---

[2] Garner died during the pendency of this appeal. Her brother, Sylvester Garner, has successfully moved to be substituted as a party. *See* M.R.A.P. 43(a); *Gollott v. State*, 646 So. 2d 1297, 1305 (Miss. 1994).

facts of the case." M.R.E. 702.[3]  In short, expert testimony must be relevant and reliable. *Willie v. State*, 204 So. 3d 1268, 1273 (¶12) (Miss. 2016).  It is relevant when it helps the jury understand the evidence or resolve a fact in issue.  *Id*.  It "is reliable when it is based upon sufficient facts or data, [when it] is the product of reliable principles and methods, and when the witness has applied the principles and methods reliably to the facts of the case."  *Id*.  The Mississippi Supreme Court has provided the following list of nonexhaustive factors that a trial court may consider when assessing reliability:

> whether the expert's theory can be or has been tested; whether the theory has been the subject of peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence of standards to control the technique's operation; and the general acceptance the theory has garnered in the relevant expert community.

*Id*. at 1273-74 (¶12).  As the "gatekeeper," the trial court "must make a preliminary assessment regarding the scientific validity of the reasoning or methodology underlying the expert testimony and the proper application of that reasoning or methodology to the facts of the case at issue."  *Id*. at 1274 (¶12).

¶16.    Garner claims that all three experts' opinions should have been excluded under the reasoning discussed in *Hawkins v. Florida*, 933 So. 2d 1186 (Fla. Dist. Ct. App. 2006).  Mark Hawkins was convicted of the unlicensed practice of medicine causing death, felony third-

---

[3] Effective July 1, 2016, Rule 702 was "amended as part of the general restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules."  M.R.E. 702 advisory committee's note. We quote the version of Rule 702 that was in effect at the time of Garner's trial.

degree murder, and culpable negligence after he injected silicone into Vera Lawrence's buttocks, and she died a few hours later due to what was described as "massive systematic silicone embolism." *Id*. at 1187-88. At Hawkins's trial, Dr. Erston Price, the associate medical examiner who conducted Lawrence's autopsy, "testified that Lawrence was injected in the subcutaneous tissue in her buttocks, which broke capillaries within the area of the hips and buttocks, and allowed the silicone to travel into the bloodstream." *Id*. at 1188. "In other words, the silicone essentially clogged the veins and arteries until the heart could not pump blood sufficiently to sustain the body." *Id*. Dr. Price explained "that even though the silicone was not injected intravascularly, it 'could have migrated into' [Lawrence's] bloodstream." *Id*.

¶17. Based on the evidence that the victim "had many, many injections of silicone over a considerable period of time," Dr. Price could not "rule out the possibility that prior silicone injections may have contributed to Lawrence's death." *Id*. Dr. Price also "conceded that she was not an expert regarding the mechanism or speed that silicone migrates through the body." *Id*. And "she could point to nothing to support her conclusion that an injection of liquid silicone could migrate through the vascular system as quickly as would have been necessary for the silicone injection . . . to have caused Lawrence's death." *Id*.

¶18. The *Hawkins* court held that Dr. Price's opinion testimony was inadmissible because, as she conceded, she was unqualified to render it. *Id*. at 1190. *Hawkins* also held that Dr. Price's opinion testimony regarding the migration rate of silicone was inadmissable under

8

*Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), because the prosecution did not show that it was "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Hawkins*, 933 So. 2d at 1190. There was no testimony regarding the migration rate of silicone in the body that was "based upon scientific principles of how silicone travels in and is absorbed by the body," as compared to cases that hinge on the absorption rate of consumed alcohol. *Id*. Garner reasons that the prosecution's three physician experts should not have been allowed to testify that the March 2012 silicone injections were the cause of Gordon's death.

¶19. First and foremost, our Supreme Court has rejected the *Frye* "general acceptance" test, which "can result in the exclusion of relevant evidence or the admission of unreliable evidence." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (¶23) (Miss. 2003). Second, the facts in *Hawkins* are not exactly on point with this case. Lawrence died within hours of receiving silicone injections. *Hawkins*, 933 So. 2d at 1188. Gordon died days after her silicone injections. In *Hawkins*, "there was evidence of chronic use of injections of silicone." *Id*. Here, there was no such evidence. According to Gordon's medical records, her family said she had received prior silicone injections "at least twice." But Barber testified that Gordon had never received silicone injections prior to the ones that Garner performed. And although Lawrence had "trouble breathing" shortly after receiving silicone injections, and her death was caused by "massive systematic silicone embolism," there was no testimony that silicone was discovered in any particular part of her body. *Id*. Instead,

there was only testimony that "Lawrence's organs were 'oily.'" *Id*. In this case, there was testimony that pulmonary emboli were discovered during Gordon's treatment, and silicone was discovered in her lungs during her autopsy. And third, unlike Dr. Price in *Hawkins*, none of the prosecution's experts conceded that they were unqualified to offer their opinions. In short, neither the legal standard nor the precise circumstances of *Hawkins* apply to this case. Rather than finding that *Hawkins* is persuasive authority to exclude any of the expert testimony at issue, we examine each witness's testimony under Mississippi law.

### A. Dr. Mendieta

¶20. During the prosecution's direct examination, Dr. Mendieta testified that "100 percent" of his practice was devoted to plastic or reconstructive buttocks surgery, and he had performed more than 2,500 procedures during his career. He said that silicone injections are "very dangerous" due to the immediate risk of death from pulmonary emboli. However, he did not opine regarding the cause of Gordon's death during direct examination.

¶21. On cross-examination, Dr. Mendieta responded affirmatively when asked whether he remembered seeing records in which Gordon and her family "had indicated that she had received two or three previous butt injections[.]" In response to further questions, Dr. Mendieta testified that silicone from prior injections could not have caused Gordon's death. Dr. Mendieta also explained that the risk of death was related to the technique and placement of silicone injections.

¶22. On redirect, the prosecution asked Dr. Mendieta about the "time frame that death

10

occurs" after someone receives silicone injections. Dr. Mendieta answered that death "could occur almost immediate[ly] to almost like three or four weeks[,]" but "[t]he majority of them will occur . . . around the first few days." When asked about the symptoms prior to death, Dr. Mendieta said that one might "experience shortness of breath," coughing, or chest pain. Garner objected "as far as the time[ ]frame" because there were "really no studies and no data here . . . ." The circuit court sustained Garner's objection.

¶23. The prosecution then asked when death would occur after silicone injections. Dr. Mendieta answered, "Days." Garner objected again. She argued that the prosecution had not provided that information during discovery, and that Dr. Mendieta's testimony was "speculative because [there were] so many variables . . . ." The circuit court asked the prosecution to lay a foundation and "[s]how that [Dr. Mendieta] has knowledge about this area." In response to the prosecution's next question, Dr. Mendieta testified that he had not treated people who had received silicone injections and subsequently died from them, but he "had been consulted on it," he understood "the entire process of silicone," and it was his "specialty." The prosecution began to ask Dr. Mendieta whether he had "read literature regarding" some subject, but Garner's attorney objected and asked to approach the bench before the prosecution could finish its question. After the unrecorded bench conference, Dr. Mendieta testified without additional objection that if death were going to result from silicone injections, it would occur within "days" or "weeks."

¶24. On appeal, Garner claims the circuit court erred when it allowed Dr. Mendieta's

redirect testimony. According to Garner, Dr. Mendieta's testimony was unreliable and beyond the scope of his expertise as a plastic and reconstructive surgeon. Garner also argues that Dr. Mendieta did not rely on any scientific method or principle to reach his conclusion. She adds that Dr. Mendieta did not mention the speed that silicone travels through the body.

¶25. The circuit court did not abuse its discretion when it allowed Dr. Mendieta's redirect testimony. During direct examination, Dr. Mendieta testified that there was an "immediate" risk of death after receiving silicone injections. On cross-examination, Garner's attorney asked Dr. Mendieta questions suggesting that Gordon died due to prior silicone injections. Having essentially asked Dr. Mendieta to opine as to what caused Gordon's death, Garner then sought to prevent Dr. Mendieta from testifying further on that subject during his redirect testimony. But "[w]hen the defense attorney inquires into a subject on cross-examination of the State's witness, the prosecutor on rebuttal is unquestionably entitled to elaborate on the matter." *Cavett v. State*, 717 So. 2d 722, 726 (¶22) (Miss. 1998). After Garner asked whether prior injections caused Gordon's death, it was logical for the prosecution to ask Dr. Mendieta to explain why they had not. Dr. Mendieta did so when he clarified the time frame that death could result after receiving silicone injections. Thus, the circuit court did not abuse its discretion when it allowed Dr. Mendieta's redirect testimony.

¶26. Even if Garner's attorney had not opened the door to Dr. Mendieta's redirect testimony, the circuit court did not abuse its discretion when it allowed him to testify regarding the time that someone could die after receiving silicone injections. "The scope of

12

the witness's knowledge and experience, and not any artificial classification, governs the question of admissibility." *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 146 (¶17) (Miss. 2007). It was within the circuit court's discretion to find that Dr. Mendieta's education, experience, and training would have made him knowledgeable of the particular dangers of silicone injections. And Dr. Mendieta's testimony helped the jury resolve a factual dispute – whether the March 2012 injections were the cause of Gordon's death.

### B.    Dr. Stankeyeva

¶27.    Next, Garner argues that Dr. Stankeyeva should not have been allowed to testify that Gordon's symptoms were caused by the March 16, 2012 injections. Dr. Stankeyeva testified as an expert in internal medicine. She was also a factual witness in that she treated Gordon in the emergency room. According to Dr. Stankeyeva, after initially treating Gordon for pneumonia, testing revealed that Gordon "had small emboli in her lungs[,] which are like clots blocking out the blood vessels in her lungs . . . ." Dr. Stankeyeva then testified that Gordon's March 2012 silicone injections had caused her symptoms. Dr. Stankeyeva explained that her opinion was "[b]ased on the information that [she] had through [Gordon's] hospital stay and the information that was given to [her] in history . . . ." Garner objected, and the circuit court excused the jury.

¶28.    Outside of the jury's presence, Dr. Stankeyeva said that Gordon's symptoms were consistent with someone who had recently received silicone injections. When asked how Dr. Stankeyeva reached that opinion, she explained that Gordon:

presented with shortness of breath. In the documentation from Piedmont Hospital where she came first it states that she developed symptoms right after receiving injection[s]. At our hospital she had a CAT scan which showed - - pulmonary emboli[,] which is consistent with what may happen with a silicone injection, and she had a silicone injection about which she told us. So putting all this information together the most likely scenario that explained her clinical picture was silicone embolization into her lungs from an injection [that she] received on March 16th.

Dr. Stankeyeva also said that "in order for silicone to get into the lung[,] it has to enter the bloodstream, and one way for it to enter the bloodstream would be [that] the injection of the needle penetrated the blood vessel." She went on to opine that prior injections had not caused Gordon's death. After voir dire, Garner argued that Dr. Stankeyeva was not qualified to testify regarding the cause of Gordon's death. Garner also argued that Dr. Stankeyeva's conclusion was unreliable for a number of reasons. The circuit court held that Dr. Stankeyeva could testify as to her treatment of Gordon, but she could not testify "as to the cause of death."

¶29. After the jury returned to the courtroom, Dr. Stankeyeva testified that "the cause of [Gordon's] symptoms was thought to be pulmonary embolism[s] in her lungs[,] which were thought to be caused by silicone" injections that Gordon received on March 16, 2012. She further opined that a needle had punctured a blood vessel in Gordon's buttocks, and the silicone followed her bloodstream until it lodged in small blood vessels in Gordon's lungs.

¶30. On appeal, Garner argues that Dr. Stankeyeva's testimony was not sufficiently reliable because it had not been verified through scientific testing or subject to peer review. Garner also argues that Dr. Stankeyeva did not know how silicone reacted in the body, and she could

14

not be certain that prior injections had not caused Gordon's symptoms. According to Garner, Dr. Stankeyeva improperly believed that the most recent injections caused Gordon's symptoms based solely on their temporal proximity.

¶31. As with Dr. Mendieta, it was within the circuit court's discretion to allow Dr. Stankeyeva's testimony. Dr. Stankeyeva's testimony related to her treatment of Gordon, and the likely causes of Gordon's symptoms. In part, Dr. Stankeyeva testified as a lay witness. "[A] treating physician [may] testify as a lay witness about the facts and circumstances surrounding the care and treatment of the patient." *Griffin v. McKenney*, 877 So. 2d 425, 439 (¶50) (Miss. Ct. App. 2003) (citing *Scafidel v. Crawford*, 486 So. 2d 370, 372 (Miss. 1986)). However, Dr. Stankeyeva was also an expert in internal medicine. Based on her education, training, and experience, Dr. Stankeyeva was qualified to offer her expert opinion regarding how silicone can enter the bloodstream and lodge in one's lungs, and why that would support a conclusion that recent silicone injections were the cause of Gordon's symptoms. That expert testimony was helpful to the jury, and it was within the circuit court's discretion to find that it was sufficiently reliable. Furthermore, *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 593 (1993), does not state that expert testimony is per se inadmissible if the substance of the testimony has never been the subject of peer review. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). It is unclear how the time between Gordon's injections and her death could be reduced to a reproducible, testable event – particularly given the illicit, clandestine nature of the circumstances. But that does not necessarily mean

15

that a medical professional would be unable to reliably conclude that the sudden onset of Gordon's symptoms could not be traced to her most recent injections. We find that it was within the circuit court's discretion to allow Dr. Stankeyeva's expert testimony.

### C. Dr. Atkinson

¶32. Finally, Garner argues that Dr. Atkinson should not have been allowed to testify that the March 16, 2012 silicone injections caused Gordon's death. Dr. Atkinson testified as an expert in forensic pathology. He explained that there was a "clear[,] viscous liquid" within cyst-like spaces in Gordon's buttocks. He also found hemorrhaging, and explained that "[i]f there's hemorrhage, that means it's relatively acute, meaning relatively recent." He said that it would have occurred within a week or two of Gordon's death. According to Dr. Atkinson, some of the silicone's proximity to a hematoma, a "large collection of blood," suggested that "injecting all of this silicone into the soft tissue under the skin led to the hemorrhages and led to the disruption of . . . the vasculature[,] which ultimately led to [Gordon's] death with the silicone emboli." When Dr. Atkinson began to testify about the silicone found in Gordon's lungs, Garner's attorney objected, and the circuit court excused the jurors from the courtroom.

¶33. Outside of the jury's presence, Garner's attorney voir dired Dr. Atkinson about his "training . . . with respect to silicone." Dr. Atkinson explained that silicone was one of many foreign substances that may enter a body, and it was "incorporated in medical school, residency, fellowship, et cetera." Unsatisfied, Garner's attorney continued to ask Dr.

16

Atkinson about his specific training with silicone. Dr. Atkinson responded that "in forensic pathology, [he] . . . deals with foreign substances such as silicone injected into the body." Still unsatisfied, Garner's attorney asked if Dr. Atkinson had "taken a class with silicone in the name." Dr. Atkinson said he did not know whether there was such a class. In response to further questions, he did not know whether he had taken a class where he was required to read a book or article about silicone, and he had not written any books, much less one about silicone. As for the rate that silicone would move through one's body, Dr. Atkinson could not provide a precise answer. However, he testified that there were "a lot of parameters" regarding that subject, it depended on how the silicone entered the bloodstream, and once there it would "move at roughly the speed of the blood." Dr. Atkinson also said that it was his first case in which silicone was the cause of death, although he had another case after Gordon's. He added that "every case is unique to some degree."

¶34. After voir dire, Garner argued that Dr. Atkinson was unqualified to testify that Gordon died because of the March 2012 silicone injections, and the methodology for his conclusion was not sufficiently reliable. The circuit court overruled Garner's objection. The jury returned to the courtroom, and Dr. Atkinson testified that the March 2012 silicone injections were the cause of Gordon's death. He also testified that "in many . . . capillary beds [in Gordon's lungs] there was just silicone throughout[,] which is what led to the symptoms that she had and ultimately her death." Dr. Atkinson also explained that he could tell the substance was silicone because when he viewed stained tissue samples under a microscope,

17

he noticed that "when you run it through your stainer, the actual silicone gets dissolved away, so you end up with perfect little punched[-]out spaces where the silicone was when the tissue was embedded in the paraffin wax." Dr. Atkinson described it as "a fairly straightfoward and easy diagnosis to make under the microscope . . . ."

¶35. Garner reasserts that Dr. Atkinson was unqualified to opine that the March 2012 silicone injections caused Gordon's death. The circuit court did not abuse its discretion when it held that Dr. Atkinson, a board-certified forensic pathologist, was qualified to testify regarding the cause of Gordon's death based on his "training, skill, and experience." The fact that it was his first autopsy involving someone who had died from pulmonary emboli related to silicone injections does not invalidate his training, experience, or education. Likewise, the circuit court did not abuse its discretion when it held that the methodology for Dr. Atkinson's conclusion was sufficiently reliable. Dr. Atkinson explained that the rate in which silicone enters the bloodstream would be subject to a number of parameters. There was no suggestion that this fatal event could be reduced to something testable. But as Dr. Atkinson explained, once the silicone entered Gordon's bloodstream, it would have traveled through the body at the same rate as her blood. "Requiring that the subject of expert testimony be known to a certainty is not necessary . . . because, as the *Daubert* Court pointed out, 'there are no certainties in science.'" *Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara*, 908 So. 2d 716, 723-24 (¶15) (Miss. 2005). This issue is meritless.

## II. Conspiracy to Commit Wire Fraud

18

¶36. Garner argues that she should not have been convicted for conspiring with Stewart to commit wire fraud by falsely representing that Garner was a licensed medical professional, and by causing Gordon to electronically transfer $200 to Stewart. According to Garner, the doctrines of collateral estoppel and/or res judicata preclude her from being found guilty of conspiracy because Stewart had been acquitted of that charge in January 2014. *See Stewart v. State*, 211 So. 3d 724, 726 (¶7) (Miss. Ct. App. 2016). Garner reasons that the circuit court erred when it denied her motion to dismiss the conspiracy charge.

¶37. Neither res judicata nor collateral estoppel precludes Garner's conspiracy conviction. "[R]es judicata is a doctrine of public policy designed to avoid the expense of multiplicity of litigation and foster reliance on judicial action by minimizing possibilities of inconsistent decisions." *Webster v. State*, 817 So. 2d 515, 522 (¶29) (Miss. 2002). One of the four necessary identities – the parties to the cause of action – is not satisfied because Garner was not a party to Stewart's trial. *See id* at (¶31).

¶38. Collateral estoppel is also inapplicable because Garner was not a party to Stewart's trial. *See State v. Oliver*, 856 So. 2d 328, 331 (¶7) (Miss. 2003) ("[C]ollateral estoppel provides that an issue of ultimate fact determined by a prior judgment may not be *relitigated between the same parties* in a subsequent action." (Emphasis added)). In fact, the Mississippi Supreme Court has held that collateral estoppel "doesn't work at all in criminal cases." *Id*. "This is so because by no stretch of the imagination can a not[-]guilty verdict be said to establish affirmatively that the defendant was innocent of the crime." *Id*. Instead, it:

19

means that the jury failed to find beyond a reasonable doubt that the defendant was guilty. The jury may well have concluded that there was strong evidence against the defendant though of a lesser dignity than beyond a reasonable doubt. For example, the jury may have found by a preponderance of the evidence that the defendant was guilty. The jury may even have considered that the evidence of guilt was clear and convincing but because it did not rise to the dignity of beyond a reasonable doubt nevertheless, taking their oaths seriously, the jurors returned a not[-]guilty verdict.

*Id*. It is the prohibition against double jeopardy, rather than collateral estoppel, that precludes re-prosecution of a defendant who had been acquitted incident to a prior trial. *Id*. at 332 (¶7).

¶39. Regardless of the precise legal terminology, Garner's argument is essentially that Stewart's acquittal for conspiracy must result in her own acquittal. The Fifth Circuit Court of Appeals has rejected a practically identical claim and held that the acquittal of all other alleged co-conspirators does not prevent an accused from being convicted of the same conspiracy. *United States v. Zuniga-Salinas*, 952 F.2d 876, 878 (5th Cir. 1992). This is because the acquittal of the alleged co-conspirators may have been the result of mistake, compromise, or lenity. *Id*. Although *Zuniga-Salinas* is not binding precedent, we agree with its reasoning. Thus, Stewart's acquittal for conspiracy – in and of itself – has no impact on Garner's conviction for the same offense.

¶40. That leaves Garner's claim that there was insufficient evidence to find her guilty of conspiracy to commit wire fraud. More specifically, Garner claims that there was insufficient evidence that she and Stewart had an agreement to commit wire fraud. As we review this issue, we consider the evidence in the light most favorable to the State. *Graham v. State*, 204 So. 3d 329, 336 (¶21) (Miss. Ct. App. 2016). "If any reasonable trier of fact

20

could have found the essential elements of the crime beyond a reasonable doubt, [an appellate c]ourt will not disturb the verdict." *Graham v. State*, 120 So. 3d 382, 387 (¶18) (Miss. 2013).

¶41. "A conspiracy occurs when two or more [people] agree to accomplish an unlawful purpose, or agree to accomplish a lawful purpose unlawfully." *Id*. at (¶19). "A conspiracy is a completed offense and does not require proof of an overt act in furtherance of the conspiracy." *Id*. "[N]o express agreement is required; an agreement can be inferred from the surrounding circumstances, such as the declarations, acts[,] and conduct of the alleged conspirators." *Id*. The government may prove that someone is guilty of conspiracy "entirely by circumstantial evidence," but there must be "some evidence that a defendant has associated [her]self with the venture in some fashion, participated in it as something that [s]he wished to bring about, or sought by [her] action to make it succeed." *Id*.

¶42. The prosecution essentially alleged that Stewart and Garner had an agreement to induce Gordon to wire Stewart a $200 referral fee by fraudulently representing that Garner was a nurse. The problem is the complete lack of evidence, direct or circumstantial, that Stewart knew Garner was not a nurse. Stewart was not called as a witness during Garner's trial. No evidence even suggested that Stewart knew Garner was not a nurse. "An individual acting alone and without a partner may not conspire . . . ." *Mitchell v. State*, 572 So. 2d 865, 867 (Miss. 1990) (citing *James v. State*, 481 So. 2d 805, 808 (Miss. 1985) ("One who 'conspires' with himself . . . is not guilty of the crime of conspiracy in this state.")). "The

21

union of the minds of at least two persons is a prerequisite to the commission of the offense, or, stated differently, at least two persons must agree for a conspiracy to exist." *James*, 481 So. 2d at 808. "It is not required before one may be guilty of conspiracy that he either initiate the plan or have intended to pull the trigger himself. So long as the accused has knowingly undertaken to play a part in a common plan [to commit an unlawful act], he is guilty of conspiracy." *Id*. at 810. Garner was not accused of wire fraud by using Stewart as an instrument to support her claim to be a nurse. Viewing the evidence in the light most favorable to the State, there was no evidence of a union of Stewart's and Garner's minds regarding the fact that Garner was not a nurse. Said differently, the record is silent as to whether Stewart earnestly believed that Garner was a nurse. It follows that reasonable jurors could not have found Garner guilty of conspiracy. *See Lee v. State*, 756 So. 2d 744, 747 (¶10) (Miss. 1999) ("The evidence was insufficient to show a recognition on the part of the conspirators that they [we]re entering into a common plan and knowingly intend[ed] to further its common purpose."). Consequently, we reverse the circuit court's judgment finding Garner guilty of conspiracy to commit wire fraud and render a judgment of acquittal to that charge.

**CONCLUSION**

¶43.    The circuit court did not err when it allowed the expert testimony challenged above. And although Stewart's acquittal for conspiracy did not preclude Garner's conspiracy conviction as a matter of law, the circuit court erred when it denied Garner's JNOV motion

22

challenging her conviction for conspiracy to commit wire fraud. Garner's conviction for depraved-heart murder is affirmed, and her conspiracy conviction is reversed and rendered.

¶44. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, WILSON, WESTBROOKS AND TINDELL, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**CARLTON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶45. In this case, I would affirm the judgment and conviction of the circuit court, including Garner's conviction for conspiracy to commit wire fraud. I find that the majority misapplied the law as to the conspiracy to commit wire fraud charge as set forth in Count III of Garner's indictment. I therefore concur in part and dissent in part with the majority's opinion. The majority states that the record contains no evidence, direct or circumstantial, that Stewart earnestly believed that Garner was a nurse. Upon its determination that no evidence exists to show a union of Stewart's and Garner's minds regarding the fact that Garner was not a nurse, the majority finds that the circuit court erred by denying Garner's motion for a judgment notwithstanding the verdict (JNOV) challenging her conviction for conspiracy to commit wire fraud. The majority then reverses Garner's conviction for conspiracy to commit wire fraud (Count III) and renders a judgment of acquittal as to that charge.

¶46. When reviewing the sufficiency of the evidence, we "must give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015) (internal quotation marks omitted). The

23

supreme court has explained that "if *any* rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." *Id*.

¶47.    Count III of Garner's indictment charged as follows:

> [B]ased on a series of acts connected together and constituting parts of a common scheme or plan, on or about March 16, 2012, in Hinds County, Mississippi, [Garner] did conspire with another person to commit a crime, to-wit: on or about March 16, 2012, [Garner] and [Stewart] did willfully, unlawfully, and feloniously, corruptly agree, conspire and confederate, each with the other, to commit wire fraud, in violation of [s]ection 97-19-83 . . . by making or causing to be made a false representation to [Gordon] that [Garner] was a licensed medical professional when in fact she was not, and by causing the transfer of two hundred dollars ($200.00) from [Gordon] to [Stewart] by the use of a Green Dot card, and for the purpose of executing such scheme or artifice or attempting so to do, transmitted or caused to be transmitted by mail, telephone, wire, electromagnetic waves, microwaves, or other means of communication or by person, any writings, signs, signals, pictures, sounds, data, or other matter across county or state jurisdictional lines, in direct violation of [s]ection 97-1-l(a)[.]

¶48.    Jurisprudence reflects that "the elements of a conspiracy 'require recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose.'" *Berry v. State*, 996 So. 2d 782, 786-87 (¶12) (Miss. 2008) (quoting *Sanderson v. State*, 883 So. 2d 558, 560 (¶8) (Miss. 2004)).  To prove conspiracy, the State must "show that two or more persons agreed to commit a crime or agreed to accomplish an unlawful purpose." *Id*. at 787 (¶12) (quoting *Morgan v. State*, 741 So. 2d 246, 255 (¶26) (Miss. 1999)).  However, the State is "not required to show that the parties entered an express or formal agreement.  A conspiracy can be proven by the acts and conduct of the

24

alleged conspirators and can be inferred from the circumstances." *Id*. at (¶13). This Court

has also held that "conspiracy can be proven entirely by circumstantial evidence." *Thomas

v. State*, 180 So. 3d 756, 762 (¶19) (Miss. Ct. App. 2015) (internal quotation marks omitted).

¶49.    Turning to review the evidence presented at trial, the transcript reflects that Barber

testified that Gordon and Stewart communicated via email over several years regarding

Gordon's desire to receive butt enhancements. The State submitted evidence showing that

in one email Gordon sent to Stewart, dated November 14, 2011, Gordon told Stewart that she

"is still looking for a good butt job like yours. If you are interested in helping me with a

referral please give me a call." Gordon also told Stewart that she would compensate her "for

this secretive information." Barber testified that Stewart refused to give Gordon the

information over the phone, so Barber and Gordon flew to New York in February 2012 to

meet Stewart. Barber stated that while in New York, Stewart told Barber and Gordon that

"a lady named Tracey" performed her butt injections, and had been doing so for years.[4]

Barber testified that Stewart expressly represented to her and Gordon that Garner was a

nurse. Barber testified that during the New York trip, she and Gordon became aware that

---

[4] We recognize that "[a]n out-of-court statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." *Farris v. State*, 764 So. 2d 411, 429 (¶60) (Miss. 2000) (quoting M.R.E. 801(d)(2)(E)) (internal quotation marks omitted); *see also Garrison v. State*, 726 So. 2d 1144, 1150 (¶16) (Miss. 1998) (quoting M.R.E. 801(d)(2)(E)) (internal quotation marks omitted) ("[A] statement by a co-conspirator of a party during the course and in furtherance of the conspiracy is not hearsay."). We review the trial court's admission or suppression of testimony for an abuse of discretion. *Anderson v. State*, 62 So. 3d 927, 933 (¶13) (Miss. 2011).

Stewart wanted $200 for a referral fee for providing Garner's information to them: "We knew about the Green Dot referral fee ever since New York."

¶50. Barber stated that on March 16, 2012, she and Gordon traveled from Atlanta, Georgia, to Jackson, Mississippi, so that Gordon could receive butt injections from Garner. According to Barber, as soon as she and Gordon arrived in Jackson, they stopped at a Walgreens so that Gordon could obtain a Green Dot MoneyPak card to wire $200 to Stewart. Barber testified that Stewart had originally planned to meet them at Garner's house, but the morning of the trip, Stewart informed Gordon that she was not going to be in Jackson that day. Barber stated that "before [they] left Atlanta[,] Gordon was on the phone with [Stewart] and [Stewart] was on speakerphone saying that she was going to be here so that's why [Gordon] had to get the Green Dot."

¶51. Barber also testified that on the morning of the trip, Garner and Gordon had been in communication, and Garner gave Gordon an address, which Gordon wrote down.[5] Barber testified that she originally thought Gordon wrote down Garner's address, but it was actually the address to the Walgreens. Barber explained that "[she] found out throughout this

---

[5] The trial testimony reflects the following exchange:

Q.  You just told us that you had [Garner's] number; right?

A.  She had [Garner's] number. [Garner] gave her the address to the Walgreens. Those addresses, those notes that she wrote down, those address[es] came from [Garner]. We [were] thinking it's the house but it was to the Walgreens.

investigation that that address that [Gordon] wrote was never to [Garner's] house[,] it was to the Walgreens so [Gordon] could wire the money over to [Stewart] before she [could] even find out where [Garner's] house [was] at." On redirect examination, Barber also clarified that Garner, not Stewart, sent Gordon the directions to Walgreens:

Q.    Real quick, Ms. Barber, just so we're clear[,] the directions that you received that morning[,] who were they from?

A.    [Garner].

Q.    Okay. Now, these directions were not to [Garner's] house, were they?

A.    No, it was to the Walgreens.

Q.    And before you got to [Garner's] house you had to wire the money to [Stewart]; right?

A.    Yes, she did.

¶52.    Barber testified that after arriving at Walgreens, Gordon paid the $200 toward the Green Dot MoneyPak from Walgreens, but that she (Barber) texted the numbers to Stewart to complete the wire process. Barber stated that she and Gordon later received confirmation from Stewart telling them that she had received the $200. Barber and Gordon then called Garner, who gave them directions to her house.

¶53.    Barber testified that when she and Gordon arrived at Garner's house, Garner "was standing in scrubs and she did say she was a nurse and we went from there." Barber stayed in a "little waiting area" in Garner's house while Garner and Gordon went into another room. Barber testified that immediately after Garner injected Gordon, Gordon informed Barber that

27

she was in pain. Barber testified that Gordon started coughing before they even left Garner's house. According to Barber, Garner suggested that Gordon take Benadryl and cough syrup.

¶54. While traveling back to Atlanta, Barber testified that Gordon was vomiting and having trouble breathing. Barber stated that she had to stop multiple times to let Gordon defecate on the side of the road. Barber testified that she and Gordon called Stewart and relayed Gordon's symptoms to her. Stewart assured them that she had similar symptoms after receiving injections, and she suggested that they stop and get a breathing treatment. Stewart told them not to stop at any hospitals on the way back to Atlanta. Stewart also instructed them "not to tell what happened and to say that [Gordon] was a smoker[.]" Barber testified that Gordon did not want her to stop at a hospital, explaining that Gordon "was listening to them, listening to what they said," and that Gordon wanted to "wait it out."

¶55. The record reflects that Helene Youngblood, the administrator of Willow Creek Nursing Home, testified that Garner worked at the nursing home from October 2000 through December 2010. Youngblood stated that Garner worked at the nursing home as a cook in the dietary department, and not as a nurse. The jury also heard testimony from representatives from the Mississippi State Board for Massage Therapy and the Mississippi State Board of Medical Licensure stating that Garner was not a licensed massage therapist or nurse. The record also shows evidence seized from Garner's residence included numerous needles, large-gauge syringes labeled "for veterinary use only," ten bottles of superglue, cotton balls, a massage table, and a large container of silicone.

¶56. Nicole Murlowski, a representative from Green Dot Corporation, explained that "[a] Green Dot MoneyPak is used to load cash onto a prepaid debit card, so you then have the ability to purchase and pay and swipe transactions, debit transactions, online transactions." Murlowski testified that every Green Dot transaction and purchase goes through servers in Las Vegas, Nevada, and Los Angeles, California. Murlowksi testified that at 11:30 a.m. on March 16, 2012, a MoneyPak pin was purchased at Walgreens and loaded onto an account later that day. Murlowski stated that according to her records, Stewart received the $200 from the Walgreens Green Dot MoneyPak transaction. Shannon Brown, regional operations manager for Regions Bank, also provided testimony that $1,500 in cash was deposited into Garner's account at 4:27 p.m. on March 16, 2012.

¶57. Lee McDivitt, an investigator with the Mississippi Attorney General's Office, testified that he subpoenaed Stewart's and Garner's phone records from AT&T. Investigator McDivitt stated that according to these records, there were a total of sixteen calls between Garner and Stewart on March 15 and 16, 2012. Yehoshua Blauch, an AT&T employee, also testified that Stewart's and Garner's phone records reflected sixteen calls between them on March 15 and 16, 2012.

¶58. The indictment reflects that Garner and Stewart were named as conspirators, and the record reflects sufficient evidence of the elements of the charged conspiracy upon which the jury could find Garner guilty beyond a reasonable doubt. *See Cowart*, 178 So. 3d at 666 (¶41). After reviewing the evidence presented at trial, I submit that the record contains

sufficient evidence to show that Garner did conspire with Stewart to commit wire fraud by making a false representation to Gordon that Garner was a licensed nurse, when in fact Garner was not a licensed nurse, causing Gordon to transfer $200 to Stewart. I would therefore affirm the judgment of the circuit court.