# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00538-COA

**MARTIN BLAKE PUGH A/K/A MARTIN B. PUGH A/K/A BLAKE PUGH A/K/A MARTIN PUGH**                                                                                 **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                                                                   **APPELLEE**

DATE OF JUDGMENT:                  03/31/2017
TRIAL JUDGE:                            HON. GERALD W. CHATHAM SR.
COURT FROM WHICH APPEALED:   DESOTO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:       JOHN T. LAMAR JR.
                                              TAYLOR A. HECK
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                              BY: KAYLYN HAVRILLA MCCLINTON
DISTRICT ATTORNEY:                  JOHN W. CHAMPION
NATURE OF THE CASE:                CRIMINAL - FELONY
DISPOSITION:                          AFFIRMED: 09/18/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., FAIR AND TINDELL, JJ.

### GRIFFIS, P.J., FOR THE COURT:

¶1.     This case involves the alleged sexual battery of an unconscious seventeen-year-old girl by three young men, one of whom recorded a portion of the sexual conduct on Snapchat. Martin Blake Pugh, Jayland Christipher Brittmon, and Matthew Anderson Craddock were indicted on the charges of conspiracy to commit sexual battery and sexual battery of an incapacitated person. Craddock was further indicted on the charge of depicting a child under the age of eighteen years engaging in sexual conduct.

¶2.     Brittmon subsequently pleaded guilty to the conspiracy charge and to the reduced

charge of simple assault. Craddock pleaded guilty to aggravated assault. Pugh proceeded to trial and was found guilty of both conspiracy to commit sexual battery and sexual battery of an incapacitated person.

¶3. Pugh was sentenced to serve one year in the custody of the Mississippi Department of Corrections (MDOC), with six months suspended, followed by four years and six months of post-release supervision on the conspiracy charge, and one year in the custody of the MDOC, with one year suspended, on the sexual battery charge, to run concurrently with the sentence for conspiracy. He was ordered to pay $200 restitution to the District Attorney; $1,763 restitution to the DeSoto County Circuit Court Clerk; a $500 fine; $100 to the Crime Victim Compensation Fund; and all court costs. Pugh was further ordered to register as a sex offender upon his release from incarceration.

¶4. Pugh now appeals and argues: (1) the circuit court erroneously admitted into evidence the Snapchat video as well as various text-message conversations among the parties, (2) there is insufficient evidence to support his conviction of conspiracy to commit sexual battery, and (3) the numerous evidentiary errors amount to cumulative error and mandate reversal. We find no error and affirm.

FACTS

¶5. On April 5, 2015, at approximately 3:00 a.m., Drew Kazemba received a Snapchat video from Craddock that showed "two guys having sex with a girl [who] looked unconscious, and it was a black guy and then there was a white guy on the other end having

2

oral sex with her."[1] Kazemba saved the video because the girl looked unconscious. He showed the video to his mother and ultimately turned the video in to Marshall County law enforcement.

¶6. At trial, Kazemba testified that Craddock admitted to being one of the guys in the video and identified the unconscious-looking girl as Gina Warren.[2] The Snapchat video was offered and admitted into evidence as Exhibit 1, with no objection by Pugh.

¶7. Following Kazemba's testimony, Brittmon testified regarding the events of the night. Brittmon explained that on the night of Saturday, April 4, 2015, he, along with Pugh, Craddock, Kate Hill, and Blake Conner, went to a party in Byhalia. Gina, Brittmon's close friend, was also at the party and, according to Brittmon, spent most of the time flirting with Conner. Brittmon stated he did not see Gina flirt with Pugh or Craddock.

¶8. Later that night, Gina asked Brittmon for a ride to Hannah Ferguson's house. Brittmon, Pugh, Craddock, Hill, Conner, and Gina subsequently left the party around midnight. Brittmon testified that at the time they left the party, Gina was "pretty drunk." They dropped Hill off at her house and decided to go to Waffle House to eat. However, Brittmon explained that once they arrived at Waffle House, they "decided not [to eat] after [they] had to help [Gina] inside — [s]he couldn't make it alone to the restroom, so [they] decided just to leave." However, they did not take Gina to Hannah Ferguson's house "[b]ecause at one point [Gina] stated she didn't want to go, and then [they] figured it would

---

[1] The record shows Brittmon is a black male born in 1995; Pugh and Craddock are both white males, born in 1996, and in 1998, respectively.

[2] For privacy purposes, we substitute a fictitious name for the minor victim.

3

be easier for [them] to just go to [Brittmon's] house and not to worry about it."

¶9.     When they got to Brittmon's house, Conner got in his car and left.  Brittmon stated that they "[had] to pretty much help [Gina] inside" as she was "still in the same condition." Once inside Brittmon's house, Brittmon, Pugh, Craddock, and Gina went to Brittmon's bedroom.  Although they were going to send Gina upstairs, Gina "jumped in bed and got undressed."  Brittmon and Pugh then got in the bed with Gina.  Craddock was on the floor or in an adjoining bathroom.

¶10.    According to Brittmon, Gina unbuckled Pugh's pants and began performing oral sex on him.  Brittmon was about to tell them to get out when Gina grabbed his hand and stuck it in her pants.  Brittmon stated they all "start[ed] messing around" and "pretty much all three had sex with [Gina] at some point throughout the night."  Brittmon explained that Craddock got involved "randomly throughout the escapade."  Brittmon had sex with Gina first, then Pugh, then Craddock, and then Brittmon had sex with Gina again for a second time.  The Snapchat video, previously admitted into evidence, was then published to the jury.

¶11.    Following publication of the video, Brittmon testified that there was no break in the time period while the three men were having sex with Gina.  Instead, "[i]t happen[ed] all at the same time."

¶12.    Brittmon further testified that he recalled seeing a flashlight but did not realize that it was a Snapchat video.  Brittmon learned of the Snapchat video "[o]nce everything [w]as finished" and he checked his phone.  Brittmon agreed that the video was received shortly after the incident occurred.

4

¶13. Following the incident, Brittmon and Pugh took Craddock home. Brittmon testified that they discussed the video at one point but did not talk about it a lot. However, Brittmon stated that Pugh was aware of the video at that time. After Brittmon and Pugh dropped off Craddock, they returned to Brittmon's house and went to sleep.

¶14. The next morning, Gina woke up and asked why her clothes were off. Brittmon told her that she had gotten hot. Neither Brittmon nor Pugh advised Gina that they had had sex.

¶15. Several hours later, Gina texted Brittmon and the following conversation occurred:[3]

Gina:       Hey! Thanks [f]or letting me crash at your house.

Brittmon:   [H]aha no problem. [B]ut I gotta tell you somethin[g].. we kinda had sex last night and I feel so bad about it. I wouldn't have done it but you kept grabbin at my wang lol[.] I wanted to tell you this morning but you didn't remember and that made me feel even worse. [B]ut you deserve to know the truth.

Gina:       You're not joking are you?

Brittmon:   [U]nfortunately I'm not[.]

Gina:       Shit happens don't worry about it[.]

Brittmon:   [C]ool beans[.]

Gina:       [Brittmon,] are you sure you aren't just making this up because I swear to God I got there[,] threw up[,] and went to bed[?]

Brittmon:   Why would I make this up haha[?]

Gina:       Idk a joke[.]

Brittmon:   [L]ol[,] no as much as I wish it was[.]

_____

[3] The text-message conversation was offered and admitted into evidence as Exhibit 2, with no objection by Pugh.

¶16.    Gina again texted Brittmon on Monday, April 6, 2015, and asked about the Snapchat

video.  Their conversation was as follows:[4]

    Gina:        [Brittmon,] wtf is this[?]

    Brittmon:    [Craddock] probably made up a story cus that did not happen.

    Gina:        Was he even at your house??  Hannah [F]erguson apparently said there is a video of me or something but I don't believe it[.] I know you wouldn't let something like this happen to me [Brittmon].  I'm already disappointed with me and you because obviously I was plastered[,] but if this shit is true I'm probably going to be pissed[.]

    Brittmon:    [Y]eah that dickhead walked in with his [message was cutoff.]

Brittmon explained that he told Gina that Craddock walked in on them while they were

having sex and took a video on his phone.

¶17.    Following his text-message conversation with Gina, Brittmon texted Craddock and

Pugh and advised that people were aware of the Snapchat video.  The following group

discussion occurred:[5]

    Brittmon:    CRADDOCK[,] WHY DOES [GINA] KNOW ABOUT THE SNAPCHAT YOU FUCKIN IDIOT[?] YOU ARE GETTING YOUR ASS BEAT[.]

    Craddock:    How does she know??  I didn't tell anyone[.]

    Brittmon:    [Y]our stupid sent it to people and they fuckin talk you dumb piece of shit[.] [S]omeone mentioned the snap[.] [F]uck you

---

[4] The text messages were offered and admitted into evidence as Exhibit 3, with no objection from Pugh.

[5] The group discussion was admitted into evidence as Exhibit 4.  The pages of Exhibit 4 appear to be out of order.  We include the text-message conversation in the order it appears in the record.

[Craddock;] we ain't even cool[.]  I told her u walked in while me and her were fuckin just [to] fuck with me and got it on snap[;] that's it[.]

Craddock:  [redacted for the jury]

Brittmon:  [A]lready did ya fuck[.] [W]ho the fuck did you send it too[?]

Craddock:  I don't think [Gina] knows.  And hold on let me look[.]

Brittmon:  I hate you[.]

Craddock:  No you don't.

Brittmon:  [N]o seriously[,] fuck you[.]

Craddock:  I didn't know anyone would talk bruh.

Brittmon:   [I]t's high school that's all you motherfuckers do[.]

Craddock:  I don't.

Brittmon:  [C]all [Gina] right now and tell her y[ou] made that up . . . otherwise ur cut off[.]

Pugh:  God damn kid fucking grow up[.]

Brittmon:  [redacted for the jury]

Craddock:  Wth[.] Hold on I'm texting [Gina.]

Brittmon:   [Y]ou wouldn't be chill either if you were me ya douche. [T]ell your friends to SHUT THE FUCK UP.

Craddock:  She said "Okay thank you so much [Craddock] I appreciate it." It's fine.

Brittmon:  [Y]ou think this is gonna be the end of it?

Craddock:  It better be or [w]hoever ran their mouth will get their ass kicked[.]

Brittmon:    [T]ell her you had your dick out or some bull shit[.]

Craddock:    No I can't change the story.

Brittmon:    [C]us so many people know obviously dick face[.]

Craddock:    Then she'll know something's up.

Brittmon:    [W]hat is she saying to you[?]

Craddock:    [redacted for the jury]

Brittmon:    [redacted for the jury]

Brittmon:    [T]ell everyone you told to shut the fuck up right now or ur dead[.]

Craddock:    I did.  I only sent it to my close "friends" so I must have some fake friends[.]  Deny it[.]

Brittmon:    [I]dk yet bruh no reply[.] [Pugh is gonna call Hannah and tell her the story that he [t]old [Gina.]

Craddock:    But what is Hannah gonna do[?]

Brittmon:    [O]h tell her parents . . . some shit we don't need[.] [M]y phones on 2%[.]

Craddock:    [Gina] doesn't believe them.  And I promise if I found out who ran their mouth I'll tell [you all] and we can jump them[.]

Brittmon:    I'm not tryna beat somebodies ass, I want you to find out and tell them to shut their fucking mouths. [H]ow many people did you send this to[,] like goddamnit kid.

Craddock:    7.  And they are all "close" to me but not[.]

Craddock:    She read?

Brittmon:    [H]er receipt ain't on so idk[.]

Craddock:    I gotcha.  I think we will be okay[.]

Brittmon: I'm just tryna put it behind me[.]

Craddock: Me too[.]

Brittmon: [UR] not allowed to be on snapchat around me[.]

Craddock: I have [a]nd I think [Gina] [i]s taking care of Hannah[.]

Brittmon: I texted Hannah myself and sent some bullshit[.]

Craddock: Stick to the I walked in[.]

Brittmon: [D]uh[.]

Craddock: Tell me what she says[.] What did she say to you?

¶18. Brittmon testified that following the group discussion, he thought they were in the clear. However, he was subsequently contacted by a police officer and interviewed. Brittmon stated he initially told the police officer "a story about how [he] wasn't originally aware of Snapchat, and then how [Craddock] just came in at some point and filmed [him] having sex with [Gina]." Brittmon admitted to the officer that he, Craddock, and Pugh all had sex with Gina, but he maintained that Gina initiated it. When asked by the officer why Gina looked unconscious in the video, Brittmon advised, "because she was fucked up."

¶19. Importantly, Brittmon testified that he did not believe Gina was competent enough to give consent. Brittmon acknowledged that in the Snapchat video, Gina was not reaching for Craddock's penis or trying to put his penis in her mouth. Instead, Craddock was holding his own penis and trying to put his penis in Gina's mouth. Brittmon stated Gina was not pushing Craddock's penis away because "[s]he was in a state of mind not able to properly respond."

¶20. The State's last witness was Gina. Gina testified that she had never met Pugh before

9

that night but that he was dating one of her friends, Hill. Gina further testified that although she and Brittmon were friends, she had never had a sexual relationship with him and did not desire to have one. Gina admitted that she drank at the party and stated she felt drunk and woozy in the car after the party. Gina testified that the last thing she remembers from that night was throwing up in a dark bathroom in an unknown location. She had no recollection of going to Waffle House.

¶21. Gina first learned of the Snapchat video from a friend. Gina stated that Brittmon, Pugh, and Craddock subsequently contacted her. She explained that Brittmon did not tell her that she had had sex with Pugh or Craddock, Pugh told her that she was "being flirty" but did not advise that they had had sex, and Craddock did not advise her that they had had sex.

¶22. Gina denied initiating sex with Brittmon, Pugh, or Craddock. She said that Brittmon, Pugh, and Craddock told her that "it could go away if [she] said it was consensual."

¶23. Hill testified on behalf of Pugh and stated that on the night in question, Gina was "drinking excessively" at the party, and referred to Gina as a "lightweight." Hill explained that the group left the party no later than 2:30 a.m. because she had to be home around 3:00 a.m. According to Hill, Gina appeared to be okay at the party and seemed coherent during the car ride after the party. Hill stated she had no concerns for Gina's safety. However, Hill acknowledged that after the party, she was dropped off first and did not know what subsequently happened.

¶24. Pugh testified in his own defense and admitted that he got drunk at the party. He further admitted that he and Gina had sex for "a couple of minutes" right after she performed

10

oral sex on him. Specifically, Pugh explained that Brittmon had sex with Gina first while Gina performed oral sex on him, then he had sex with Gina. Afterwards, Pugh got on the floor and went to bed.

¶25. Pugh recalled seeing Craddock in Brittmon's bedroom that night, but stated he did not know about the Snapchat video until they turned the lights on and he checked his phone. Pugh acknowledged that Gina was "drunk" and "acting wild" but stated at no time while at Brittmon's house or before did Gina seem to be incoherent.

¶26. Following his convictions and sentence, Pugh filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which the circuit court denied. Pugh timely appealed.

ANALYSIS

I.    *Admission of Evidence*

¶27. Pugh first argues the circuit court erred in its admission of the Snapchat video and the various text-message conversations among the parties. We separately address each evidentiary issue, but we note that the standard of review is the same.

¶28. "The admission or suppression of evidence is within the sound discretion of the [circuit court] and will not be reversed unless there is an abuse of that discretion." *Sturkey v. State*, 946 So. 2d 790, 794 (¶11) (Miss. Ct. App. 2006). "We will only reverse under that standard if the admission of the evidence results in prejudice or harm to the opposing party, or if it adversely affects a substantial right of the party." *Id*.

a.    *Snapchat Video*

11

¶29. Pugh asserts "[t]he Snapchat video was inadmissible for multiple reasons." However, we find this issue is procedurally barred. Pugh did not object to the admission of the Snapchat video at trial. "[F]ailure to make a contemporaneous objection waives an issue for purposes of appeal." *Boyd v. State*, 175 So. 3d 1, 4 (¶13) (Miss. 2015). Because Pugh did not object to the admission into evidence of the Snapchat video, he is procedurally barred from raising its admission as an issue on appeal.

¶30. Notwithstanding the procedural bar, we find this issue is meritless. Pugh first argues the video was not authenticated. Mississippi Rule of Evidence 901(a) provides for the authentication of evidence as a condition precedent to admission. Pursuant to Rule 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

¶31. Here, the record shows Kazemba reviewed the Snapchat video prior to taking the witness stand and testified that the video fairly and accurately represented what he received from Craddock. Kazemba testified that Craddock was one of his Snapchat contacts and explained how he was able to save the video upon receipt. Kazemba further testified that Craddock and Gina were two of the individuals in the video and that Gina "looked unconscious."

¶32. Additionally, both Brittmon and Pugh admitted to having sex with Gina and testified that they received the Snapchat video from Craddock shortly after the incident occurred when they checked their phones. Moreover, Brittmon testified that he remembered seeing a

12

flashlight while he was having sex with Gina, but he did not realize it was a Snapchat video.

¶33. Overall, we find the State produced sufficient evidence to support a finding that the Snapchat video admitted into evidence at trial was what the State claimed it was—that is, a Snapchat video from Craddock depicting the alleged sexual battery of Gina. Accordingly, the Snapchat video was properly authenticated.

¶34. Pugh next argues the video was irrelevant because the State never established a timeline or when Craddock recorded the video. Under Mississippi Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the case." "Rule 401 is construed broadly in favor of admitting evidence with even slight probative value." *Ross v. State*, 954 So. 2d 968, 993 (¶44) (Miss. 2007).

¶35. Here, the video is relevant because it shows Gina's condition during the incident and corroborates the State's testimony regarding the incident. Pugh asserts "the State only narrowed the timeline . . . to sometime between shortly after midnight and 3 a.m." and notes that "in a case where the charge is sexual battery of an incapacitated person, even seconds make a huge difference when determining whether someone is incapacitated or not." However, such assertion does not affect the relevancy of the video. Pugh's argument regarding the three-hour time frame was addressed during trial and was for the jury to consider and resolve.[6]

¶36. Pugh last argues "any probative value the video had was substantially outweighed by

---

[6] We note that Pugh's witness, Hill, testified that they left the party no later than 2:30 a.m., thereby narrowing the timeline.

13

the danger of unfair prejudice and/or misleading the jury." Mississippi Rule of Evidence 403 is considered the ultimate filter through which all evidence must pass. *Palmer v. State*, 939 So. 2d 792, 795 (¶10) (Miss. 2006). Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

¶37. Pugh claims "the jury certainly could have gone into deliberations with the (mis)understanding that [he] was one of the males in the video and/or that the video was taken during the time period that [he] had sexual contact with Gina." However, Kazemba testified that the video showed "two guys having sex with [Gina] . . . a black guy and . . . a white guy." As previously noted, Brittmon is a black male. Although Craddock and Pugh are both white males, Kazemba testified that Craddock, not Pugh, was in the video. Thus, the testimony makes clear that Pugh was not in the video.

¶38. Regardless, Pugh admitted to having sex with Gina that night, and the testimony shows that Pugh had sex with Gina at or around the same time as Brittmon and Craddock. Simply because Pugh was not actually recorded and/or depicted in the Snapchat video is of no consequence.

¶39. We find the Snapchat video was "in some way related or linked to the crime charged." *See Goree v. State*, 748 So. 2d 829, 838 (¶19) (Miss. Ct. App. 1999) (When determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice to the defendant, "[t]he key issue remains whether [the evidence] was in some way

14

related or linked to the crime charged."). As a result, its admission did not violate Rule 403.

¶40. Overall, we find the Snapchat video was properly authenticated and relevant, and its probative value was not substantially outweighed by the danger of unfair prejudice or misleading the jury. Accordingly, the circuit court did not abuse its discretion in the admission of the Snapchat video.

*b.* *Text-message Conversations Between Brittmon and Gina*

¶41. Exhibits 2 and 3 are text-message conversations between Brittmon and Gina sent and received April 5th and 6th, after the incident occurred. Pugh argues "Exhibits 2 and 3 are classic examples of hearsay for which the State provided no exception." As with the Snapchat video, Pugh failed to object to the admission of Exhibits 2 and 3 at trial. Thus, Pugh's claim regarding the admissibility of the exhibits is procedurally barred. *Boyd*, 175 So. 3d at 4 (¶13).

¶42. Regardless of the procedural bar, we do not find that any prejudice or harm resulted from the admission of Exhibits 2 and 3. *Sturkey*, 946 So. 2d at 794 (¶11). Both Brittmon and Gina testified at trial and advised the jury about what happened that night, the condition Gina was in at the time, and the discovery of the Snapchat video. Exhibits 2 and 3 do not provide new or additional information. Instead, the same information included in the exhibits was offered through Brittmon and Gina's testimony. Thus, any error in the admission of Exhibits 2 and 3 was harmless. *See Reynolds v. State*, 136 So. 3d 452, 459 (¶22) (Miss. Ct. App. 2014) (finding that there was no hearsay issue, but if there was, any error would be harmless, since the witness testified to the same event at trial).

## c. Text-message Conversation Among Brittmon, Craddock, and Pugh

¶43. Exhibit 4 is thirteen pages of text messages among Brittmon, Craddock, and Pugh sent and received after the incident occurred. Pugh claims Exhibit 4 is inadmissible hearsay and should have been excluded.

¶44. The State offered Exhibit 4 in support of the conspiracy charge. Prior to trial, Pugh objected to the admission of Exhibit 4 "based on the fact that [Craddock] ha[d] previously pled guilty to aggravated assault and, therefore, . . . is not a true coconspirator and [Exhibit 4] would be hearsay as [it] relates to [Craddock]." The circuit court overruled the objection at that time but advised defense counsel that it would revisit the issue when the evidence was offered. When the State sought to admit Exhibit 4 at trial, defense counsel objected based "on [the] previous objection." The circuit court allowed the State to develop the evidence outside the presence of the jury. Thereafter, the circuit court overruled the objection.

¶45. On appeal, Pugh does not reassert that Craddock was not a true coconspirator in light of his guilty plea. Instead, Pugh now claims the circuit court failed to follow the requisite procedure for the admission of a coconspirator's testimony. However, Pugh did not raise this issue prior to or during trial, and he did not include this issue in his posttrial motions.

¶46. "Issues raised for the first time on appeal are procedurally barred from review as they have not first been addressed by the [circuit] court." *Jackson v. State*, 856 So. 2d 412, 415 (¶12) (Miss. Ct. App. 2003). "As an appellate court, we cannot find that a [circuit court] committed reversible error on a matter not brought before [it] to consider." *Id*. Moreover, an objection cannot be enlarged on appeal to include an omission not objected to at trial.

16

*McGarrh v. State*, 249 Miss. 247, 276, 148 So. 2d 494, 506 (1963).  Because Pugh's argument on appeal differs from the objection raised at trial, we find it to be procedurally barred.

¶47.    Notwithstanding the procedural bar, we find Exhibit 4 is admissible under Mississippi Rule of Evidence 801.  Pursuant to Rule 801(c), a hearsay statement is one that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  However, "[s]tatements made after the completed act pertaining to a coverup of that act" are admissible under Rule 801(d)(2)(E).  *Williamson v. State*, 512 So. 2d 868, 879 (Miss. 1987), *overruled on other grounds by Hansen v. State*, 592 So. 2d 114, 134 (Miss. 1991).

¶48.    Here, the statements included in Exhibit 4 were made after the alleged sexual battery occurred and pertained to a coverup of that act.  At trial, Brittmon acknowledged that during the text-message conversation, he, Craddock, and Pugh discussed the fact that everyone knew about the Snapchat video.  Importantly, Brittmon acknowledged that they discussed what they needed to do "to prevent anyone else from finding out about what actually happened that night."  Brittmon stated that following the group discussion, they thought they were "in the clear."  As noted in *Williamson*, one of the objectives of any conspiracy is to avoid arrest and prosecution.  *Id*.  Accordingly, contrary to Pugh's assertion, the statements included in Exhibit 4 are not inadmissible hearsay.

### d.    Conner's Text Message to Gina

¶49.    At trial, Brittmon testified that the group went to Waffle House after they left the

party. Brittmon stated they were going to eat, but "decided not to after [they] had to help [Gina] inside." Brittmon explained that "[Gina] couldn't make it alone to the restroom, so [they] decided just to leave."

¶50. During Pugh's direct testimony, he was questioned about Gina's condition at Waffle House. Pugh acknowledged that Gina went to the bathroom, but stated he did not see Gina stumbling or staggering, and that no one had to help her to the car. With regard to Brittmon's testimony, Pugh stated, "until yesterday [when Brittmon testified], that was never — no one ever said that."

¶51. On cross-examination, Pugh again testified that no one ever said Gina had trouble at Waffle House or needed help to the restroom. The State then asked Pugh, "[s]o is it not true that Blake Conner texted Gina and said [she] almost passed out when [they] were at Waffle House?" Defense counsel objected based on hearsay. The circuit court overruled the objection because Pugh was "on cross-examination."

¶52. The State continued its questioning until defense counsel again objected and a bench conference was held. Following the bench conference, the circuit court sustained the objection and allowed counsel the opportunity to lay a foundation for the line of questioning. The State then asked Pugh, "What did you mean on direct when you said no one had ever said that before?" Pugh explained that "[n]o one's ever said [Gina] needed help getting out of Waffle House . . . I've talked to Blake Conner . . . [h]e never saw it . . . I've never heard it until yesterday when you asked [Brittmon] about it." Defense counsel then objected as follows:

18

> Once again, the initial question was — his initial statement was that nobody had ever said anything about [Gina] having to be helped out of Waffle House to the car. Now we're trying to back door into some type of hearsay about the alleged text that this individual, that [Pugh] did not see.

The circuit judge responded, "Well, if he doesn't know, he can certainly say he doesn't know. I'll overrule the objection." At that point, the State advised it would move on to a different line of questioning.

¶53. Pugh argues the State's reference to Conner's text message to Gina was inadmissible hearsay. We disagree. A review of the record shows that the State was not offering the statement to prove the truth of the matter asserted (i.e. that Gina almost passed out at Waffle House). Instead, the State referenced Conner's statement to show that, despite Pugh's testimony, someone other than Brittmon had stated that Gina had trouble at Waffle House. "[S]tatements can be offered solely for the purpose of demonstrating that they were said . . . ." *Fair v. State*, 766 So. 2d 787, 791 (¶9) (Miss. Ct. App. 2000) (citing *Gayten v. State*, 595 So. 2d 409 (Miss. 1992)).

¶54. Regardless, any error in the admission of the statement was harmless. An error is considered harmless "if the same result would have been reached had [it] not existed." *White v. State*, 48 So. 3d 454, 458 (¶17) (Miss. 2010). Conner's text message challenged Pugh's testimony that no one ever said Gina had trouble at Waffle House. However, Pugh testified that Gina was drunk that night; Brittmon testified Gina was drunk at Waffle House, which was why they left; and Gina testified she was drunk and did not remember going to Waffle House. Thus, even if the statement was erroneously admitted, such error was harmless as there was already testimony before the jury regarding Gina's condition at Waffle House.

## II. Sufficiency of the Evidence of Conspiracy

¶55. Pugh next argues the State did not present sufficient evidence of a conspiracy. Thus, Pugh claims the circuit court erred in denying his motion for a JNOV.

¶56. When "reviewing a case for sufficiency of the evidence, this Court considers each element of the offense and reviews all of the evidence in the light most favorable to the verdict." *Lenoir v. State*, 224 So. 3d 85, 90 (¶18) (Miss. 2017). "[We] must accept as true all credible evidence consistent with guilt" and "give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Id*. at 90-91 (¶18) (internal quotation mark omitted). "[We] may reverse only when, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Id*. at 91 (¶18). "Thus, if any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." *Id*.

¶57. Under Mississippi Code Annotated section 97-1-1(1)(a) (Rev. 2014), a conspiracy occurs "[i]f two (2) or more persons conspire . . . [t]o commit a crime . . . ." "An alleged conspirator's participation in a conspiracy may be proved entirely by circumstantial evidence." *Graham v. State*, 120 So. 3d 382, 388 (¶19) (Miss. 2013). "However, there must exist some evidence that a defendant has associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed." *Id*. "[N]o express agreement is required; an agreement can be inferred from the

20

surrounding circumstances, such as the declarations, acts and conduct of the alleged conspirators." *Id*. Even without explicit testimony concerning a conspiracy, the jury can still infer from the circumstances that a conspiracy existed. *Humphrey v. State*, 74 So. 3d 923, 926 (¶12) (Miss. Ct. App. 2011).

¶58. Here, we find sufficient evidence was presented to allow a jury to infer that a conspiracy existed. Brittmon testified that when he, Pugh, Craddock, and Gina arrived at his house, they had to help Gina inside due to her condition. At that point, Gina got into Brittmon's bed and got undressed. Although there was an empty bedroom upstairs, Brittmon and Pugh got in the bed with Gina. Craddock was nearby, either on the bedroom floor or in the adjoining bathroom. Brittmon testified that he, Pugh, and Craddock "pretty much had sex with [Gina] at some point throughout the night." Brittmon further testified there was never a break where they left and came back later. Instead, "[i]t happen[ed] all at the same time." The next morning, when Gina asked why her clothes were off, neither Brittmon nor Pugh advised Gina of the sexual intercourse. Instead, she was told that she had gotten hot.

¶59. Additionally, the various exhibits, including certain text messages, show Gina's surprise when learning of the incident, as well as Brittmon, Pugh, and Craddock's attempt to explain and coverup the incident. Notably, Pugh advised Craddock, "if you're gonna do shit with us[,] part of that is not broadcasting it to all your dumbass friends that are gonna tell everyone . . . [y]ou made a young mistake. . . ."[7] Moreover, Gina testified that Brittmon, Pugh, and Craddock told her that if she would say that the sex was consensual, all of this

---

[7] This text-message conversation was offered by Pugh and admitted into evidence as Exhibit 7.

would go away.

¶60.    Overall, we find sufficient evidence exists to support Pugh's conviction of conspiracy to commit sexual battery. Accordingly, the circuit court did not err in denying Pugh's motion for a JNOV.

            III.    *Cumulative Error*

¶61.    Pugh last argues "the numerous evidentiary errors in this case amount to cumulative error that mandates reversal." "The cumulative error doctrine stems from the doctrine of harmless error, which holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Thompson v. State*, 990 So. 2d 265, 270 (¶12) (Miss. Ct. App. 2008).

¶62.    Here, we do not find that Pugh was deprived of a fundamentally fair trial by the cumulative effect of any individual errors. Accordingly, we affirm the judgment of the DeSoto County Circuit Court.

¶63.    **AFFIRMED.**

        **LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**

22