IRVING, P.J.,
dissenting:
¶ 4⅜. I cannot agree with the majority that the several letters that Graham wrote from her jail cell are admissible into evidence pursuant to Rule 804(b)(3), as I find that the content of the letters, regarding the circumstances of Tabitha’s death, is based on what Dixon told Graham about how Tabitha was killed, not upon Graham’s personal knowledge of the circumstances of Tabitha’s death. Therefore, I dissent.
¶ 45. It is clear that Hartfield sought to introduce Graham’s letters to show that someone other than he committed the murder. Rule 804(b)(3) provides in pertinent part that “[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.” Since Hartfield offered the letters in an effort to exculpate himself, he was required to show corroborating circumstances that clearly indicated the trustworthiness of the letters.
¶ 46. With respect to the letters in question, it should be pointed out that the majority has not quoted some relevant content that Graham included in the margins of her letter to Hartfield. This is what she wrote in the margins:
And truth be told, if I would’ve had the chance I would’ve done my best to make you mine and been a good woman to you. But that’s neither here nor there. And it doesn’t matter anymore. I’ll never have a chance to be with anyone ever again anyway.
[Romona] told my friend Janice that you and I hurt [Tabitha] because she [ (Tabitha) ] caught us together and [Tabitha] was going to beat me up and divorce you! The b-is stupid!
¶ 47. The majority explains its finding — of corroborating circumstances indicating the trustworthiness of Graham’s statements — as follows:
Gñ°aham consistently admitted to assisting in Tabitha’s murder and the disposal of her body. Graham’s admission of guilt in the letters is inconsistent with Hartfield’s alleged guilt. Graham admits cooperation with Dixon and details the steps they took. Graham acknowledged that the conspiracy to kill and bury Tabitha was between herself and Dixon, not Hartfield. In the letter to Hartfield, Graham confesses to assisting Dixon and apologies for it. In fact, the only evidence of potential guilt against Hartfield is Dixon’s later testimony.
Graham was situated to commit the crime. After her arrest, she admitted to being present for the conspiracy, murder and burial. She admitted to playing an active role throughout. She knew details of the crime that only a person with direct knowledge would have known. On the other hand, Hartfield testified he was as asleep on the couch, a fact that both Graham and Dixon confirmed.
Next, Graham admitted in her letters to taking part in the murder. In Dixon’s statement, he [sic] killed Tabitha. Both of these statements occurred shortly after the murder and Graham’s and Dixon’s arrests.
Graham provided all of the details of the murder, which were substantiated by Dixon’s statements to the police, her mother, and Decker. Such close relationships as between Graham and her mother, and Graham and Decker, indicates trustworthiness.
Most importantly, there was independent corroboration. First, Dixon admitted that he committed the murder. Dixon’s admission is consistent with Graham’s description of what happened. *1113 Next Graham’s statement of what happened was consistent with Dr. Steven Hayne’s findings in the autopsy. Finally, the details of the crime were consistent in Dixon’s testimony and Graham’s letters.
Maj. Op. at (¶¶ 27-31).
¶ 48. First, with all due respect, I must point out that the majority has relied upon information that was contained in Graham’s statement to police, not in her letters to Hartfield, Dixon, and her mother to justify admission of those letters. Graham’s statement to the police confessing to murdering Tabitha was not admitted into evidence during Hartfield’s trial. In fact, in Graham’s statement to police, she “explained that no one had helped her kill Tabitha.” Graham v. State, 120 So.3d 382, 385 (¶ 10) (Miss.2013). Second, I see nothing in Graham’s letters to support the italicized statements that the majority attributes to her. Furthermore, a proper interpretation of Graham’s letters leads to the inescapable conclusion that she was not present when Tabitha was killed and that the circumstances surrounding Tabitha’s death were related to her by Dixon, although her account of the post-death circumstances is based on her personal knowledge. Therefore, the critical statements depicting the circumstances of Tabitha’s death, which the majority finds are corroborated by Dixon’s testimony, are nothing more than double hearsay, not admissible under Rule 804(b)(3). Moreover, contrary to the majority’s finding, Dixon’s testimony with respect to the circumstances of Tabitha’s death does not corroborate the statements made by Graham in her letters to Hartfield, her mother, and James Decker regarding how Tabitha was killed.
¶ 49. Dixon testified that Hartfield killed Tabitha, while Graham says in her letters that Dixon told her that Dixon killed Tabitha. And Graham makes it clear that her role in slashing Tabitha’s wrists and assisting with the disposal of Tabitha’s body was done under duress, as she feared for her life at the hands of Dixon. Regarding Tabitha’s death, Graham, in her letter to Decker, said the following:
I went to get a shower. When I got out I got in the bed. [Dixon] came in and said he was gonna try to bring [Tabitha] inside and that Hartfield was on the couch asleep. I said ok but he’d probably have to carry her in once she passed out [because] she refuses to come in. Well[,] he went outside[,] and I layed [sic] down and drifted off. About [thirty] minutes or [an] hour later[, Dixon] came back in the bedroom [and] woke me up. He was all excited and crazy looking[,][b]ouncing around the room. I was like [sic][,] “[W]hat’s going on? What’s up [with] you? Ya know.” He started sayingf,] “I did it! I did it! I killed her!” I ran outside and saw [Tabitha] laying [sic] face down in the driveway. I ran up to her and couldn’t get her to wake up. I put my head on her back[,] and there wasn’t a heartbeat. I started freaking out! [Dixon] was standing beside me with a kitchen knife in his hand. I was on my knees beside [Tabitha,] and I looked up at him and started crying [and] screaming!,] ‘What did you do[,] [Dixon]? Why? Why did you do this?” He was smiling — his eyes almost glowing out of his head[ — ][and] was telling me how it excited him, it gave him a rush, it turned him on. My dog leash was laying [sic] beside her head. I went to get up on my feet and run[,] and he dropped the knife in the dirt and grabbed the leash and caught me around the neck [and] by my hair. He brought me face to face and looked me in my eyes and told me I wasn’t gonna tell anybody[,] and he was making *1114 sure of it. He said if I didn’t do what he told me to he’d kill me and like it — the same way he did her.
¶ 50. In addition to the contradiction between Dixon’s testimony and the statements in Tabitha’s letters, there is an another problem. It is evident that Graham has an affinity for Hartfield. Her letter to him clearly reveals that she was motivated to help him because of her affection for him. Considering the totality of the circumstances, I can find no corroborating circumstances of trustworthiness. Therefore, I cannot find that the trial judge abused his discretion in not allowing the letters to be admitted into evidence during Hartfield’s trial. But even if I were to find an abuse of discretion, I would find that it was harmless error to not allow admission of the letters, because the jury acquitted Hartfield of murder. I see nothing in the letters bearing on the issue of conspiracy to commit murder, the single offense of which Hartfield was found guilty. Therefore, for the reasons presented, I dissent.
JAMES, J., JOINS THIS OPINION.