# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00655-COA

**MICHAEL SHIPP A/K/A MICHAEL KINCAID SHIPP**        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/20/2023 |
| TRIAL JUDGE: | HON. CELESTE EMBREY WILSON |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | ROBERT R. MORRIS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/30/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1. On July 8, 2020, a DeSoto County grand jury indicted Michael Shipp for conspiracy to commit murder, attempted murder, and capital murder. After a three-day trial, a jury found Shipp guilty of all counts. He was sentenced to serve five years for the conspiracy conviction, thirty years for the attempted murder conviction, and life imprisonment without parole eligibility for the capital murder conviction. The sentences were ordered to run consecutively. Shipp subsequently filed a motion for judgment notwithstanding the verdict or a new trial. After a hearing on the matter, the trial court denied the motion. Shipp now appeals his convictions, arguing that (1) there was insufficient evidence to convict him of

conspiracy to commit murder, and (2) the trial court erred in refusing his duress instruction and depriving him of his theory of defense.

## FACTS AND PROCEDURAL HISTORY

¶2. On January 31, 2020, Justin "Jut" Jones and Tavius Love met at a mutual friend's home in Whitehaven. Eventually they left and went to play dice at a gathering in the Shadow Ridge neighborhood in Olive Branch. Love described the gathering as a "family type of ordeal" and revealed that he and Jones had gambled at that same home a week prior. When they arrived, several people were there. Among the crowd were Deadrick "Dee" Williams, Willie Austin Jr., and Michael Shipp. Love did not personally know these individuals, but he remembered seeing them the week before. Jones, however, did personally know Williams, Austin, and Shipp. Williams approached Jones and extended an invitation to continue gambling at his apartment. Jones accepted and asked Love to tag along.

¶3. Jones and Love got in their vehicles and trailed Williams to Plantation Apartments, where Williams lived with his girlfriend, Sharnesha Maxwell, and their daughter. Williams was driving a Dodge Charger, which belonged to Maxwell. Austin and Shipp rode with Williams. Before reaching the apartments, they all stopped at a gas station to get cash from the ATM.

¶4. Love revealed that throughout the night, his Glock 19X gun was on his waist. Earlier that night, he claimed that he had removed his gun from the holster to clean it and left his holster in his car. Before leaving the gas station, he returned his gun to its holster and

attached it to his right hip.

¶5.     When they arrived at the apartment, Williams, Austin, and Shipp went inside first and set off the alarm system. Maxwell testified that she turned the alarm off and went back to her room to lie down. Eventually, Jones and Love exited their vehicles and went inside the apartment. Love testified that he loaned Jones four hundred dollars in twenties so that Jones would not have to break his hundred-dollar bills.

¶6.     The apartment was fairly small. The first room upon entry into the apartment was the living room. Both the kitchen and the dining room were directly across from the living room. They all convened around a table in the dining room. Williams put a blanket on a table, and the dice game commenced. Austin and Love played against each other until Austin ran out of money. When their game concluded, they watched Williams, Shipp, and Jones play against each other. Shipp eventually ran out of money and asked Williams if he could borrow one hundred dollars. Williams agreed and went to the back of the house to retrieve the money. When he returned, they resumed the dice game. Jones beat Shipp twice and Williams once. He ultimately gambled them out of hundreds of dollars.

¶7.     After the game concluded, Jones returned the four hundred dollars to Love that he borrowed before the game. Love testified that he saw Shipp whispering to Williams, who was nodding his head. Williams then proceeded to the back of the house again. Love and Jones were preparing to leave when, suddenly, Williams returned with a Smith & Wesson firearm and pointed it at Jones' head. Williams yelled, "Don't f***ing move. Give me

3

everything. I need everything." Love testified, "At the time when [Williams] raised up the gun and Shipp [saw] the gun, he kind of went towards the doorway. So he was, basically, blocking the doorway so you couldn't go outside the doorway." Williams then pointed the gun at Love and demanded he drop everything. Love put his money and keys on the table and raised both of his hands in the air. Williams instructed Shipp to remove Love's gun from his hip. Shipp complied and pointed the gun at Love. Williams then pointed his gun back at Jones. Jones handed him the money and said, "What are you doing, bro? We grew up together."

¶8. Love testified that after they handed over the money, he tapped Jones on the shoulder and said, "Let's roll. They got it. They got the money. Let's roll." Shipp then shot Love in the chest, causing him to fall into Jones. Love grabbed a nearby chair, launched it at Shipp, and charged toward him. Love testified, "I'm in survival mode. I'm trying my best to do whatever I can to get the gun out of his hand. In my head, this guy -- I'm 100 percent, this guy is fixing to kill me." They tussled and fought for the gun, and eventually they fell to the ground. Love grabbed Shipp's right wrist to prevent him from discharging the gun again. Love testified, "I scream out, 'Shipp, don't kill me.' His response, 'I'm going to kill you.'" Another shot went off, and Jones fell to the ground. Williams told Shipp to stop shooting and demanded that Jones and Love leave his apartment.

¶9. Love tried to pull Jones up, but he did not move. Terrified, Love jumped over Jones' body and ran out of the apartment. He testified, "I ran to like different doors/homes in the

4

apartment complex, knocking on the door, begging for help." While outside, he saw four individuals running to the Dodge Charger that Williams was driving earlier, so he ran in the opposite direction.

¶10. Several tenants at the Plantation Apartments reported the incident, and officers were dispatched to the scene. Captain Terri Hoskins of the Olive Branch Police Department testified that, upon arrival, she saw Love on the ground and officers trying to render aid to him. She said as she kneeled down to check on him, he grabbed her hand and begged, "Ma'am, please, don't let me die." She assured him that an ambulance was on the way and then asked him how he got injured. He replied, "Mike shot me,"[1] and revealed that he was in a Dodge Charger. The paramedics transported Love to Regional One in Memphis, Tennessee. The bullet was an inch from Love's heart. He had to undergo three surgeries and spent twenty-seven days in the hospital.

¶11. Maxwell testified that her daughter was at her mother's house on the night in question. She said after she heard gunshots, Williams came into her room to check on her. When she peeked into her living room, she saw her daughter's toys were "bloody and destroyed." She also saw a body on the floor. She said she panicked and ran outside to get in her Toyota Camry. Williams and Shipp ran behind her, got into her car, and headed to Williams' grandmother's home. Maxwell eventually noticed that Austin was trailing them in her Dodge Charger. She testified that while they were in the car, Shipp revealed that he dragged Jones'

---

[1] The record reveals that Shipp's nickname is Mike.

5

body outside the apartment to keep it from looking like the murder took place there. When they arrived at Williams' grandmother's home, Maxwell said they were trying to take her Dodge Charger. When she refused, Austin and Shipp demanded to be taken home. They all got in Maxwell's Toyota Camry, and she dropped Austin and Shipp off at Shipp's home.[2]

¶12. When they arrived at Shipp's home, Shipp placed Love's Glock 19X gun under the driver's seat of his vehicle. Shipp decided to go to the casino because that was his "place of refuge." He explained, "[W]hen my head is in a dark place and just something happens . . . I go there to collect my thoughts, just collect myself, get myself together." While there he drank alcohol and gambled for "about five hours." He claimed that he did not go to the police because he was "scared" and "wasn't thinking straight." Shipp testified:

> I left the casino, and I went to the store. The police had someone pulled over as I went to the store. So I come out of the store. I pulled out in front of him, and I went because I don't have any tags on the car. So I didn't want the police to see no tags on the car. I see that he's going to pull me over though. No question about that. So I went back towards the casino, and he came behind me. He looking in his rear -- in his mirror and saw I didn't have my tags. He came behind me. I pulled over. And [Austin] asked me, "What are you doing?" I said, "I'm pulling over." He said, "For what?" I said, "Why run?" And so he said, "I got a warrant." Me still not knowing what's going on and just don't know what to do, I'm like okay, okay, okay, I'm going to pull off, okay. And that's how I ended up pulling off.

¶13. Shipp and Austin led Tunica Police on a car chase that continued into Hernando. Tunica deputies contacted the Hernando Police Department to assist with ending the chase.

---

[2] Maxwell was charged with accessory. Her case was still pending at the time of Shipp's trial.

6

Lieutenant Robert Scott of the Hernando Police Department's patrol division pursued Shipp and Austin when they entered the Hernando city limits. Lieutenant Scott advised some of his officers to deploy spike strips[3] ahead of Shipp's vehicle. When they encountered the spike strips, Shipp lost control of the vehicle. It hydroplaned and eventually crashed into the embankment. Austin escaped and ran toward Crossroads Seafood and Amtel gas station. Shipp grabbed Love's Glock 19X gun from under his seat and hid it in a nearby flower bed. He then followed Austin inside Amtel. Lieutenant Scott found Austin and Shipp in Amtel and apprehended them until deputies from DeSoto County and Tunica County arrived and placed them under arrest. They also collected surveillance videos from Crossroads Seafood that had captured footage of Austin and Shipp fleeing.

¶14.    After Austin and Shipp were taken into custody, Hernando officers conducted a standard search of the area. Officer James Ratliff was able to locate the Glock 19X gun that Shipp had stashed in the flower bed. They marked the location and notified the Olive Branch Police Department. Lieutenant Ben Rushing of the criminal investigation division at the Olive Branch Police Department retrieved the gun and sent it to the crime lab for testing. A background check of the Glock 19X gun revealed that it was registered to Love. He had lawfully purchased it a year ago.

---

[3] Lieutenant Scott explained that spike strips are "triangular sleeves that hold little hollow darts that once they're run over, they'll put a substantial hole, which will deflate the tires in a fast rate but not fast enough where it will cause somebody to lose absolute control of the vehicle."

¶15. Williams eventually turned himself in to the Olive Branch Police Department. Investigators interviewed him with his attorney present. Also, his mother turned in the Smith & Wesson gun that he had on the night in question. Investigator Craig Dickson collected the gun and sent it to the crime lab for testing.

¶16. Major Sherrie Driver, who was over investigations at the Olive Branch Police Department, was heavily involved in most of the investigations throughout the case. She was present for most of the interviews throughout the case. Love was interviewed while he was recovering in the hospital, and he gave a written statement after he was released. Williams was interviewed with his attorney when he turned himself in. Austin and Shipp were interviewed while they were in custody. Major Driver testified, "Love's statement was consistent with Willie Austin and with Mr. Shipp." She said the only inconsistency between Williams' statement and the other statements regarded who pulled a gun first. Williams claimed he was not the first person to pull his gun. Love, Austin, and Shipp all maintained that he was the first person to pull his gun.

¶17. Major Driver discovered that the apartment was leased to Donna McGee, Maxwell's mother. Major Driver contacted McGee, who informed her that Maxwell was the individual actually renting and staying in the apartment. Maxwell subsequently contacted Major Driver and told her who all had been in the apartment on the night in question. Major Driver retrieved pictures of Shipp from Facebook and had Maxwell identify him.

¶18. Major Driver testified that on the night in question, her officers secured the scene,

8

collected evidence, and took pictures. She said that it was obvious there had been a struggle because the apartment was in disarray. They found broken furniture, broken toys, and blood on the couch and floor. Major Driver testified that no money was found in the apartment, but they did find drugs and scales. They discovered a bullet hole in the living room wall and in the outside storage wall. They opened the storage wall and found a projectile lodged inside the sheetrock. They also found one shell casing in the dining room and another one in the living room. This evidence was collected and sent to the crime lab for testing.

¶19.    Dr. Mark LeVaughn, a forensic pathologist, examined Jones and reviewed his case file. As part of the investigation, Dr. LeVaughn concluded that the "cause of death of Mr. Jones [was] a gunshot wound to the chest" and the "manner of death [was] homicide." A projectile was recovered from the heart and sent to the crime lab.

¶20.    Felicia McIntire was the section chief over the "Firearms and Tool Mark Unit" at the Mississippi Forensics Laboratory. She received the bullet that was removed from Jones' heart and the projectiles and cartridge cases recovered from the scene. She also received a "Glock Model 19X 9mm" gun and a "Smith & Wesson Model SD9 VE 9mm caliber" gun to examine alongside the projectiles and cartridge cases that she received. She performed several test fires on both guns and examined the markings on the cartridge cases to identify class characteristics and individual characteristics.[4] Based on all her findings, she concluded

---

[4] McIntire testified:

Class characteristics are determined by the manufacturer. So that will include

that all the projectiles and cartridge cases that she received matched the Glock Model 19X 9mm gun that Shipp used to shoot Jones and Love.

¶21.    On July 8, 2020, a DeSoto County grand jury indicted Shipp for conspiracy to commit murder, attempted murder, and capital murder. Shipp's trial commenced on February 13, 2023. The State called eleven witnesses during its case-in-chief. After the State's case-in-chief, a motion was made to amend the indictment to charge conspiracy to commit robbery instead of conspiracy to commit murder. The court denied the motion, and the State rested its case. Shipp then moved for a directed verdict. The trial court denied his motion. Shipp was the only witness to testify on his behalf. The DeSoto County Circuit Court jury ultimately found Shipp guilty of all three counts. He was sentenced to five years in custody for the conviction of conspiracy to commit murder, thirty years for the attempted murder conviction, and life imprisonment without eligibility for parole for the capital murder conviction, with the sentences ordered to be served consecutively in the custody of the Mississippi Department of Corrections. On April 30, 2022, Shipp filed a motion for judgment notwithstanding the verdict or a new trial. On May 24, 2023, the court held a hearing on the motion. At the conclusion of the arguments, the court denied the motion and

things like the caliber, the number of lands and grooves they choose to put in that barrel, the direction of the twist, the shape of their firing pin. . . . [I]ndividual characteristics, those only come about through use and abuse over time or if they're incidental to the manufacturer. So they're not made on purpose, but when metal is scraping metal, it can cause small neural areas that build up imperfections within that firearm. And all of those are unique to just this firearm and not all of them of the same make and model.

subsequently entered an order reflecting the bench ruling.  Aggrieved, Shipp now appeals.

## STANDARD OF REVIEW

¶22.    Challenges to the sufficiency of the evidence are reviewed under a de novo standard. *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020).  When determining whether the evidence is sufficient to sustain a conviction, we must ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Garrett v. State*, 344 So. 3d 849, 851 (¶12) (Miss. 2022) (internal quotation mark omitted). "We view all of the evidence in the light most favorable to the prosecution, accept all the evidence supporting the verdict as true, and give the prosecution the benefit of all favorable inferences that reasonably may be drawn from the evidence." *Id*.  "We will reverse and render if the facts and inferences favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt." *Melendez v. State*, 354 So. 3d 944, 952 (¶30) (Miss. Ct. App. 2023) (quoting *Smoots v. State*, 310 So. 3d 1184, 1189 (¶17) (Miss. Ct. App. 2020)). "However, we must affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*.

¶23.    "It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010) (citing *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009)).  "When reviewing the giving or refusal of jury instructions, we do not view the jury instructions in isolation, but instead we consider them as a whole." *Taylor v. State*,

11

109 So. 3d 589, 595 (¶18) (Miss. Ct. App. 2013) (citing *Rushing v. State*, 911 So. 2d 526, 537 (¶24) (Miss. 2005)). "If the instructions fairly state the law and do not prejudice the defendant, reversal is not warranted." *Thompson v. State*, 338 So. 3d 730, 738 (¶42) (Miss. Ct. App. 2022) (quoting *McCool v. State*, 328 So. 3d 173, 189 (¶76) (Miss. Ct. App. 2021)). "In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Id*. (internal quotation marks omitted).

## DISCUSSION

### I. Sufficiency of the Evidence

¶24.    Shipp argues that the evidence was insufficient to establish that he was guilty of conspiracy to commit murder. We disagree.

¶25.    Mississippi Code Annotated section 97-1-1(1)(a) makes it unlawful for "two (2) or more persons [to] conspire . . . [t]o commit a crime. Miss. Code Ann § 97-1-1(1)(a) (Rev. 2020). Conspiracy has been defined as the "combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy. The offense is complete without showing an overt act in furtherance of the conspiracy." *Vickers v. State*, 994 So. 2d 200, 212 (¶39) (Miss. Ct. App. 2008) (quoting *Brown v. State*, 796 So. 2d 223, 225-26 (¶9) (Miss. 2001)). "The agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts and conduct of the alleged conspirators." *Id*. "An alleged conspirator's participation in a conspiracy may be proved entirely by circumstantial

12

evidence." *Graham v. State*, 120 So. 3d 382, 387 (¶19) (Miss. 2013) (citing *Davis v. State*, 485 So. 2d 1055, 1058 (Miss. 1986)). "However, '[t]here must exist some evidence that a defendant has associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed.'" *Id.* (quoting *Davis*, 485 So. 2d at 1058).

¶26. Shipp testified that he never agreed to rob anyone or kill anyone. However, there is evidence in the record that directly conflicts with this testimony. Love testified that he saw Shipp whispering to Williams, and he saw Williams nodding his head. Immediately after this exchange, Williams went to the back of the apartment and reappeared with a gun. While Williams held Jones at gunpoint, he instructed Shipp to take Love's gun. Shipp complied, blocked the doorway, and held Love at gunpoint. After Jones and Love gave up their money, Shipp shot Love in the chest and told him, "I'm going to kill you." Then, after fighting with Love over the gun, Shipp shot Jones in the chest.

¶27. Our Supreme Court has held that the "evidence is sufficient to prove a conspiracy when all the facts and circumstances, together with the acts of the parties, reveal a common design or understood purpose to commit a crime." *Graham v. State*, 120 So. 3d 382, 388 (¶22) (Miss. 2013) (citing *Davis*, 485 So. 2d at 1059); *see also Griffin v. State*, 480 So. 2d 1124, 1126 (Miss. 1985) (citing 16 Am. Jur. 2d *Conspiracy* § 42 (1979) ("Where it is shown that the defendants by their acts pursued the same object, one performing one part and the other performing another part so as to complete it or the view to its attainment, the jury will

13

be justified in concluding that they were engaged in a conspiracy to effect that object.")). It was reasonable for the jury to infer that Shipp and Williams, by their actions, had an understood purpose to rob and murder Jones and Love.

¶28. "When this Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). "Juries may consider the full context of the evidence in determining their verdict on a charge of conspiracy." *Lollis v. State*, 373 So. 3d 1004, 1007 (¶13) (Miss. 2023) (citing *Henderson v. State*, 323 So. 3d 1020, 1024 (¶8) (Miss. 2021)). Viewing the evidence in the light most favorable to the State, we find that a rational juror could have found beyond a reasonable doubt that the State proved that Shipp and Williams entered into an agreement to murder Jones. We find no reversible error.

## II. Duress Jury Instruction

¶29. Shipp contends that he was denied his right to assert his theory of defense when the court refused his proposed jury instruction on duress (D-13) and, instead, gave the State's "confusing and unclear" duress instruction (S-15).[5] He further argues that the trial court erroneously found that his instruction was not a correct statement of the law, despite him taking it from the Proposed Mississippi Plain Language Model Jury Instructions. Shipp's

---

[5] We address this issue because both sides offered duress instructions at trial. However, because the State does not contest the duress defense on appeal, we will not address whether a duress instruction was factually warranted in this case.

14

instruction D-13 provided:

> Michael Shipp has presented evidence that he acted under duress while committing the crime charged. Duress is a legal defense. Duress is when a person is under unlawful force or pressure to commit an act that the person ordinarily would not have done in order to avoid an immediate danger. The immediate danger must exist at that time or be fast approaching. It must be of such a nature as to force that person into believing that great bodily harm or death will occur if he does not commit the criminal act. A person cannot claim duress if he had a reasonable opportunity to avoid committing the criminal act and not be exposed to great bodily harm to his body or death. Michael Shipp is not guilty of capital murder if he acted under duress. The State must prove beyond a reasonable doubt that . . . Michael Shipp did not act under duress. If the State did not prove beyond a reasonable doubt that the defendant did not act under duress, then you shall find the defendant "Not Guilty" of capital murder.

The State's instruction S-15 was crafted from practice model jury instructions as well:

> Evidence has been presented that the defendant acted under duress in committing the crime. "Duress" is the exercise of unlawful force upon a person whereby the person is compelled to do some act that he otherwise would not have done. In order for duress to be a defense to a criminal charge, the impelling danger must be present, imminent, and impending, and of such nature as to induce in that person a well-grounded apprehension of death or serious bodily harm if the act is not done. A person having a reasonable opportunity to avoid committing the crime without undue exposure to death or serious bodily harm cannot invoke duress as a defense. If the State has failed to prove from the evidence in this case beyond a reasonable doubt that the defendant acted voluntarily in committing the crime and not under duress, then you shall find the defendant not guilty.

*See* Mississippi Model Jury Instructions (Criminal) § 2:4 (Miss. Jud. Coll. 2d ed. updated Oct. 2023).

¶30. During the jury instructions conference, the State specifically took issue with the last portion of D-13, which stated, "The State must prove beyond a reasonable doubt that Michael

15

Shipp did not act under duress." The State argued that it was a misstatement of the law because duress is an affirmative defense that must be proved by the defense, not the State. The State also noted that the words "present, imminent, and impending" were missing from the Defense's duress instruction. The court ultimately refused Shipp's duress instruction, finding that it was not a correct statement of the law.

¶31. We find that Shipp's proposed instruction was a correct statement of the law. In fact, it directly tracked the language from the Proposed Mississippi Plain Language Model Jury Instructions. However, the court was within its discretion to refuse this instruction because the law regarding duress was still fairly covered in the State's instruction, which was later given by the court. "A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, *is covered fairly elsewhere in the instructions*, or is without foundation in the evidence." *Newell*, 49 So. 3d at 74 (¶20) (emphasis added) (quoting *Hearn v. State*, 3 So. 3d 722, 738 (¶45) (Miss. 2008)). The State's instruction clearly explains the law regarding duress and even includes some language that Shipp failed to include in his proposed instruction. Accordingly, we find no reversible error.

**CONCLUSION**

¶32. Based on our review of the record, the circuit court properly denied Shipp's motion for judgment notwithstanding the verdict or a new trial. The evidence presented by the State was sufficient to convict Shipp of conspiracy to commit murder. Also, the court was within

16

its discretion to refuse Shipp's proposed duress instruction because it was fairly covered in the State's duress instruction. Accordingly, we affirm Shipp's convictions and sentences.

¶33. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**